[No. H027817. Sixth Dist. May 21, 2007.]

PAJARO VALLEY WATER MANAGEMENT AGENCY, Plaintiff and Respondent, v.
RAY AMRHEIN et al., Defendants and Appellants.

1368

## COUNSEL

Johnson & James and Robert K. Johnson for Defendants and Appellants.

Harold Griffith as Amicus Curiae on behalf of Defendants and Appellants.

Maria Luisa Menchaca for Fair Political Practices Commission as Amicus Curiae on behalf of Defendants and Appellants.

Nossman, Guthner, Know & Elliott, Stephen N. Roberts, Nicole A. Tutt and Sophie N. Froelich for Plaintiff and Respondent.

Daniel S. Hentschke for Association of California Water Agencies as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**RUSHING, P. J.**—Plaintiff and respondent Pajaro Valley Water Management Agency (Agency) brought this validation proceeding to ascertain the validity of its 2003 ordinance increasing the groundwater augmentation fee to be charged to operators of wells within its jurisdiction. Defendants and appellants Ray Amrhein, Guy George, Mark Pista, San Andreas Mutual Water Company, Patrick Layhee, and John Sheffield (Objectors) appeared in opposition to the requested decree. After taking evidence, the trial court held the ordinance valid, ruling that the matter was proper for a validation proceeding, that two Agency board members did not have disqualifying conflicts of interest, and that the ordinance did not contravene constitutional limitations on the power of local entities to impose property taxes, assessments, and

property-related charges. Objectors brought this appeal, contending that the court erred in each of these determinations.

We originally issued an opinion finding no error and affirming the judgment. We granted rehearing, however, to consider the effect of *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205 [46 Cal.Rptr.3d 73, 138 P.3d 220] (*Bighorn*). In light of that decision we are now compelled to conclude that the augmentation fee is a fee or charge "imposed . . . as an incident of property ownership" and thus subject to constitutional preconditions for the imposition of such charges. (Cal. Const., art. XIII D, § 2, subd. (e), added by initiative, Gen. Elec. (Nov. 5, 1996); see *id.*, § 6.) Since the Agency made no attempt to comply with those conditions, we must reverse the judgment validating the charge.

### BACKGROUND

The area subject to the Agency's jurisdiction is home to around 80,000 persons, about half of whom reside in Watsonville. This area lies atop the Pajaro Valley Groundwater Basin, which the trial court found to be "a single, interconnected basin of fresh groundwater to supply the whole region."[1] Extraction of groundwater through wells supplies slightly over 95 percent of the water used in the basin.[2] The remainder comes from a variety of surface sources including sloughs, rivers, creeks, and springs. About 86 percent of the water used within the basin goes to agriculture.

Since the 1950's the basin's groundwater supply has been subjected to chronic overuse, resulting in overdraft and seawater intrusion. Overdraft directly depletes supply by extracting more water than is replenished (recharged) by natural processes. Recent annual extractions from the basin total about 70,000 acre-feet, which reflects an overdraft of about 9,000 acre-feet. This in turn leads to seawater intrusion, which occurs when fresh groundwater is drawn below sea level, causing seawater to flow into the neighboring freshwater, rendering it too saline for use. Freshwater has been drawn to below sea level throughout much of the basin. An Agency witness testified that if seawater were allowed to intrude unimpeded into the areas of declining ground water elevation, "it would eventually fill that void with seawater. The entire basin would be impacted." As it is, seawater intrusion renders unusable 11,000 additional acre-feet of fresh groundwater every year.

---

[1] This characterization was disputed by an expert testifying for Objectors, but the trial court's resolution of that conflict in favor of the Agency is not cogently challenged on appeal.

[2] We will use the term "basin" to describe the area subject to the Agency's jurisdiction although the groundwater basin as geologically defined is only imperfectly contiguous with that area.

Because of the depletion that has already occurred, seawater intrusion would not be halted merely by reducing extractions by the 9,000 acre-feet per year of overdraft, or even the 20,000 acre-feet of overdraft plus water lost to increased salinity. Rather, the Agency estimates that to achieve seawater exclusion by reduced extractions alone would require a reduction of about 44,000 acre-feet per year.

The Agency was created in 1984 through the Legislature's enactment, as an urgency measure, of the Pajaro Valley Water Management Agency Act. (Stats. 1984, ch. 257, § 1 et seq., p. 798 et seq., West's Ann. Wat.-Appen. (1995 ed.) ch. 124, § 124-1 et seq. (Act).) It established an agency composed of a seven-member board of directors, each of whom must be a voter and resident of the basin. (Stats. 1984, ch. 257, § 402, pp. 798, 805.) In creating the Agency, the Legislature found that "the management of the water resources within the Pajaro Valley Water Management Agency for agricultural, municipal, industrial, and other beneficial uses is in the public interest and that the creation of a water agency pursuant to this act is for the common benefit of all water users within the agency." (Stats. 1984, ch. 257, § 101, p. 798.) It declared the Agency's purpose as "to efficiently and economically manage existing and supplemental water supplies in order to prevent further increase in, and to accomplish continuing reduction of, long-term overdraft and to provide and insure sufficient water supplies for present and anticipated needs within the boundaries of the agency." (*Id.*, § 102, subd. (f), pp. 798, 799.) It decreed that the Agency "should, in an efficient and economically feasible manner, utilize supplemental water and available underground storage and should manage the groundwater supplies to meet the future needs of the basin." (*Id.*, § 102, subd. (g), pp. 798, 799.) It directed that the management of water resources under the Act be carried out in light of a number of objectives, including "the avoidance and eventual prevention of conditions of long-term overdraft, land subsidence, and water quality degradation" (*id.*, § 102, subd. (a), pp. 798, 799), the establishment of "reliable, long-term supplies" rather than "long-term overdraft as a source of water supply" (*id.*, § 102, subd. (b), pp. 798, 799), the reduction of long-term overdraft "realizing that an immediate reduction in long-term overdraft may cause severe economic loss and hardship" (*id.*, § 102, subd. (c), pp. 798, 799), and the achievement of economic efficiency by "requir[ing] that water users pay their full proportionate share of the costs of developing and delivering water" (*id.*, § 102, subd. (d), pp. 798, 799). The Legislature anticipated that "long-term overdraft problems may not be solved unless supplemental water supplies are provided." (*Id.*, § 102, subd. (g), pp. 798, 799.) Accordingly it declared that the Agency could appropriately "acquire, buy, and transfer water and water rights in the furtherance of its purposes." (*Id.*, § 102, subd. (e), pp. 798, 799.)

It declared that "[a]gricultural uses shall have priority over other uses under this act within the constraints of state law." (*Id.*, § 102, subd. (d), pp. 798, 799.)

The Act specifically empowers the Agency to adopt ordinances levying "groundwater augmentation charges on the extraction of groundwater from all extraction facilities within the agency for the purposes of paying the costs of purchasing, capturing, storing, and distributing supplemental water for use within the boundaries of the agency." (Stats. 1984, ch. 257, § 1001, p. 815.) It also authorizes the Agency to "regulate, limit, or suspend extractions from extraction facilities" (*id.*, § 711, p. 811), and provides criteria for the allocation of rights to use available groundwater (*id.*, § 712, pp. 809–810).

The Act also empowers the Agency to commence a "groundwater rights adjudication" (Stats. 1984, ch. 257, § 1106, p. 817), which would effect "the determination of substantially all rights in the groundwater basin or the area subject to the adjudication" (*id.*, § 310, p. 804). An economist testified about the effects on the local economy of a "worst case scenario" in which a groundwater rights adjudication would reduce groundwater extractions to 24,000 acre-feet per year, of which 12,000 would be allocated to residential use, leaving about 0.4 acre-feet per acre for farmers. He testified that this scenario would result in the loss of 9,000 jobs and an annual reduction in agricultural production of $360 million.[3]

In 2002, the Agency enacted, by unanimous vote, a Revised Basin Management Plan (BMP), which evaluated the problems of overdraft and seawater intrusion, examined a variety of potential solutions, identified a preferred solution, and recommended specific projects to implement it. The result was a plan whose primary components were (1) construction of a 23-mile pipeline from San Benito County to the coast; (2) construction of a coastal distribution system for delivery of water to the area west of Highway 1 within the Basin; (3) procurement of water, or water rights, from owners in the Central Valley;

---

[3] According to the Basin Management Plan, strawberries and raspberries require 2.8 and 3.7 acre-feet per acre of applied water, respectively, while deciduous crops—apparently meaning orchard crops other than citrus—require 0.7 acre-feet per year. In 1997, about 8,700 acres were devoted to strawberries and vine crops, while deciduous crops took up about 3,900 acres. Another 14,000 acres bore vegetable row crops while assorted other agricultural uses took up about 8,000 acres. The Basin Management Plan did not set out the water demands for each of these other uses but noted a general trend toward more water-intensive crops and a corresponding movement away from the less water-intensive deciduous crops. These figures, coupled with the cited testimony, however, appear to support a finding that even deciduous crops could not be reliably sustained under the "worst case scenario" described in the testimony.

(4) development of additional water supplies from local sources[4]; and (5) eventual delivery of the resulting supplies to coastal farmers as well as some farmers along the pipeline route.[5]

An Agency expert opined that the plan represents a reasonable engineering approach to achieving Agency goals, and is the most reasonable of many alternatives considered in terms of cost, environmental effects, and ability to meet those goals. The plan would bring in a total of about 18,500 acre-feet composed of 1,000 from Harkins Slough, 4,000 in recycled Watsonville water, and 13,400 in pipeline imports. The plan also sought to achieve savings of about 5,000 acre-feet through conservation. An Agency witness opined that these measures would. solve the problems of overdraft and seawater intrusion, even though they fall well short of the amount by which extractions exceed the safe yield. He gave two reasons for this conclusion, the first of which seemed to be that by eliminating coastal extractions and replacing them with irrigation from outside sources, the plan would raise the groundwater level along the coast, which in turn would retard seawater intrusion. The second reason is unintelligible as stated in testimony, having been rendered so, we surmise, by mistranscription.[6] In any event, the witness testified that if the projected solution "does not work," the plan will have put the infrastructure in place to "expand the existing system." Another expert witness testified that the application of 18,500 acre-feet at the coast would

---

[4] These sources would include recycled wastewater from Watsonville and water from the Harkins Slough project, already in place. The Agency would also establish supplemental wells to help maintain water deliveries in drier years. In addition it would seek to promote conservation.

[5] The plan apparently contemplates at least three phases. Phase One was mainly the Harkins Slough project, with additional minor elements including the acquisition of an assignment of water rights at Mercy Springs, which would supply 25 to 30 percent of the anticipated water imports. The current phase is Phase Two, consisting largely of the coastal distribution system, Watsonville wastewater recycling facilities, and acquisition of additional, water rights. Phase Three apparently consists of an "inland distribution system," providing water to inland farms at greater distances from the pipeline. As presently designed, however, the plan will supply imported water to inland farmers only when supply exceeds the coastal demand. However, depending on the Agency's success in arranging secure water supplies, there could be many years when this condition was present.

[6] According to the transcript, the witness said, "The second thing that occurs in that respect is that the groundwater table declined and the cost is reduced and, therefore, water is not flowing as well through the coast so, therefore, more water is available." It is doubtful that the witness used the word "declined," highly unlikely that he said "cost is reduced," and all but certain that he did not utter the string of words here rendered. The transcript contains numerous other probable mistranscriptions, e.g., the probable phrase "lease of a parcel upon which the facility is located" appears as the nonsensical "lease of a partial fund which the facilities located . . . ." Such transcription errors, which are by no means unique to this case, support an argument for entitling litigants to electronically record court proceedings on which their rights depend.

produce a hydraulic gradient equivalent, for purposes of excluding seawater, to reducing overall extraction by 45,000 acre-feet.

Funding for the project was expected to come from groundwater augmentation charges, such as that at issue here, along with (higher) charges on imported water, grants, and some public funds. More precisely, those portions not funded by grants or public funds would be financed by certificates of participation or selling bonds to be paid off from augmentation and delivery charges.

The Agency first collected a groundwater augmentation charge in 1994. The charge was increased from time to time by ordinance. At issue here is the Agency's Ordinance 2003-01, which increased the charge from $80 to $120 per acre-foot. An Agency witness testified that this was not sufficient to implement the BMP and that the charge would eventually rise to $158 per acre-foot. The water delivery charge would be $316 per acre-foot.

The augmentation charge is assessed against all extractors of groundwater. Although the evidence on this point is not entirely clear, there are apparently some 660 nonresidential wells, most of them operated for farming purposes, and approximately 3,000 residential wells. Many large users have metered wells; in those cases the owner of the well is charged according to actual consumption. Few if any residential well users have meters; they are charged an "estimated use rate per dwelling" of 0.6 acre-feet per year, which is the estimated average rate of consumption. For unmetered agricultural use, the Agency estimates consumption based on a number of factors. For example, the Agency assumes that an apple orchard consumes one acre-foot per year per cultivated acre of land. The Agency can adjust estimated charges if a well owner shows that estimated consumption does not accurately reflect the amount extracted. While Agency witnesses knew of no cases where this had occurred with residential well users, it has occurred with other users billed on an estimated basis.

The Agency bills these charges to the owner, as identified in parcel records, of the land on which a well appears. Upon request, the Agency will bill a tenant, but it will send a duplicate bill to the owner, whom it considers ultimately responsible. The Agency has pursued collection proceedings against tenants and has entered into payment arrangements with tenants in arrears. The general manager testified that if a case arose in which a well were shown to belong to a person other than the landowner, the Agency would bill the well owner.

On July 1, 2003, the Agency brought this action for a declaration of the validity of the ordinance increasing the augmentation charge to $120 per

acre-foot. Pursuant to Code of Civil Procedure section 860 et sequitur, the Agency named as defendants all persons interested in the validity of the ordinance. Objectors filed an answer generally denying the allegations of the complaint and asserting a number of grounds for invalidating the ordinance, including that (1) the charge constitutes "a property based tax or assessment" not enacted in compliance with governing law including Proposition 218; (2) the charge is invalid "inasmuch as certain members of the Board of Directors who voted on the Augmentation Charge Increase had a conflict of interest within the law, including but not limited to the provisions of Government Code section 87100, et seq."; and (3) the Agency is estopped to deny that the charge is an assessment on "rural domestic wells" in view of its own prior directive to the tax collectors of the affected counties to collect the charge as an assessment. A separate answer was filed by Pajaro Valley Citizens for Long Term Water Solution, a nonprofit corporation, supporting the Agency's position.

After hearing testimony from witnesses for the Agency and Objectors, the trial court entered a judgment declaring the ordinance valid. Objectors moved to set aside the judgment on the ground that the court had allowed insufficient time for them to propose contents for, and object to, the requested statement of decision. The trial court granted that motion and filed a new judgment and statement of decision. Objectors filed this timely appeal.

### I. Jurisdiction

Objectors assert that the trial court lacked jurisdiction "to decide the validity of the augmentation charge in a validation action." The argument apparently proceeds as follows: (1) a validation proceeding will only lie to determine the validity of official action where authorized "under any other law" (Code Civ. Proc., § 860); (2) the Agency predicated its complaint here on Government Code section 66022, which authorizes a validation proceeding "to . . . review . . . an ordinance . . . modifying or amending an existing fee or service charge, adopted by a local agency"; (3) for purposes of this statute, "fee or service charge" means a capacity charge; (4) the augmentation charge at issue here is only partly a "capacity charge" subject to a validation proceeding under these provisions; and (5) the trial court therefore lacked jurisdiction to render a validation judgment with respect to those portions of the charge that are not a "capacity charge."

We fail to discern how this argument can affect the outcome of this appeal. Objectors raised the point below in a trial brief alluding to another lawsuit, which was then on appeal before this court, challenging an Agency augmentation charge by reverse validation action. The trial court there had dismissed the matter for failure to comply with the special limitations period applicable

to such proceedings. (Code Civ. Proc., § 863.) After this matter was tried, but before judgment entered, a panel of this court rendered an unpublished decision in that case, holding that the augmentation fee was only partly a "capacity charge" and that insofar as it was not such a charge, the plaintiffs' objections were not subject to the special statute of limitations. (*Scurich v. Pajaro Valley Water Management Agency* (May 27, 2004, No. H025776) [nonpub. opn.] (*Scurich*).)

Objectors cited that decision to the court below, arguing that it affected the outcome here in some way. However, they later entered into a stipulation declaring that "[i]nsofar as there is any portion of the augmentation charge . . . that is not within the jurisdiction of this court for a validation action, the complaint may be deemed to have been amended to state a second cause of action among the defendants who have appeared, and the plaintiff, for declaratory relief as to the validity of Ordinance 2003-01. Nothing contained in this stipulation shall prevent the parties from raising any issue on appeal which was part of the proceedings in this case." The stipulation was executed by the Agency, Objectors, other appearing defendants, and the trial judge.

Despite this stipulation, Objectors persist in arguing that the trial court lacked jurisdiction to adjudicate the matter as a validation proceeding. The intended effect of this assertion is left to surmise. The point was offered below as a defense to the action, i.e., that the trial court lacked subject matter jurisdiction. As far as we can tell, no authority was ever provided for this proposition. In any event it would provide at most a partial defense, because Objectors do not appear to claim that the conditions for a validation proceeding are entirely lacking, only that part of the fee is not subject to adjudication in such a proceeding. The practical significance of this proposition, were we to accept it, is obscure at best. In the unpublished decision cited by Objectors, the question had the practical effect of resurrecting part of a lawsuit that the trial court had completely terminated. Here the error, if any, was the opposite—the court tried too much of the action as a validation proceeding, when only part of it was subject to such treatment. Since all parties before the court actively sought such an adjudication, this hypothetical error had no apparent effect on them. The record fails to establish, and Objectors make no attempt to demonstrate, that their argument entitles them to any particular relief.

 This would follow even if Objectors had not stipulated away whatever objection they otherwise had. If a complaint contains allegations that would otherwise oust the trial court of jurisdiction, but the facts alleged would support a declaratory judgment, the complaint may be construed— even without a stipulation—to pray for such relief. (See *Minor v. Municipal*

*Court* (1990) 219 Cal.App.3d 1541, 1547–1548 [268 Cal.Rptr. 919].) Here the Agency's right to seek declaratory relief is reinforced by Code of Civil Procedure section 869, which declares that an agency's entitlement to pursue a validation proceeding "shall not be construed to preclude the use by such public agency . . . of mandamus or any other remedy to determine the validity of any thing or matter." Thus, assuming that some or all of the augmentation fee could not properly be adjudicated in a validation proceeding, the trial court's jurisdiction could, and as far as this record shows should, be saved by viewing the judgment as one in declaratory relief.

Under the circumstances here, the only apparent distinction between a validation judgment and a declaratory judgment is its effect on absent persons. A validation proceeding is in rem (Code Civ. Proc., § 860), and yields a judgment that is "forever binding and conclusive . . . against the agency and against all other persons" (*id.*, § 870, subd. (a)). A declaratory judgment, on the other hand, is in personam (*Mills v. Mills* (1956) 147 Cal.App.2d 107, 116 [305 P.2d 61]), and generally has preclusive effect only on those who were joined or represented in the action (*Campbell v. Scripps Bank* (2000) 78 Cal.App.4th 1328, 1334 [93 Cal.Rptr.2d 635]).[7] Thus if someone other than Objectors sought to relitigate some of the issues concerning the validity of the charge, it might be open to that person to contend that some aspects of the present judgment are not conclusive on the world but only on the parties appearing here. In no sense does it appear that the court lacked fundamental jurisdiction to adjudicate the issues before it or to issue a judgment binding on the parties now before us. This makes it unnecessary to consider the Agency's arguments that the reasoning in *Scurich*, *supra*, H025776, does not pertain here.[8]

## II. *Tax, Assessment, or Property-related Charge*[9]

### A. *Introduction*

Objectors contend that the groundwater augmentation change could not validly be imposed without complying with the provisions of Propositions

---

[7] That is to say, other parties are not bound by the preclusive doctrines of res judicata (claim preclusion) or collateral estoppel (issue preclusion). The precedential effect of an appellate decision on the same issues presents a separate question.

[8] It also makes it unnecessary to consider whether the parties' mutual citation and discussion of *Scurich* violated former rule 977 of the California Rules of Court. (See now, Cal. Rules of Court, rule 8.1115.)

[9] In our previous decision we necessarily considered, and rejected, Objectors' contention that the decision to increase the extraction charge was invalid because two directors acted under a disabling conflict of interest. The Fair Political Practices Commission has filed an 11th-hour brief objecting rather obliquely to a portion of our analysis on that issue. Because we now find it unnecessary to reach the issue at all, we have excised the entire discussion.

218 (Cal. Const., arts. XIII C & XIII D, § 3) and 62 (Gov. Code, §§ 53720–53730), under which it constituted a tax, property assessment, or charge incidental to property ownership. In our previous decision we concluded, on the basis of then extant authority, that the charge did not fall within any of these descriptions. We have now concluded that while the charge is not a tax or assessment, it must be considered a property-related fee and, as such, is subject to the relevant provisions of Proposition 218.

■ As relevant here, Proposition 62 added provisions to the Government Code prohibiting any "local government or district" from imposing any "general tax" or "special tax" without voter approval. (Gov. Code, §§ 53722, 53723.) Article XIII C of the California Constitution (Article XIII C), which was enacted as part of Proposition 218, adopted by initiative in November 1996, similarly limits the power of local governments, which are broadly defined to include "any special district, or any other local or regional governmental entity" (Art. XIII C, § 1, subd. (b)) to impose taxes, all of which are classified for purposes of the article as either general or special. (Art. XIII C, § 2, subd. (a).) A general tax is "any tax imposed for general governmental purposes." (Art. XIII C, § 1, subd. (a).) A special tax is "any tax imposed for specific purposes . . . ." (Art. XIII C, § 1, subd. (d).) No general tax may be imposed, increased, or extended without the approval of a majority of the voters. (Art. XIII C, § 2, subd. (b).) "Special purpose districts [and] agencies" are altogether barred from imposing general taxes.[10] (Art. XIII C, § 2, subd. (a).) No special tax may be imposed without two-thirds voter approval. (Art. XIII C, § 2, subd. (d).) Article XIII C also attempts to guarantee to the electorate the power to reduce or "affect" local taxes, assessments, and charges by initiative. (Art. XIII C, § 3.)

■ The second component of Proposition 218 is Article XIII D of the California Constitution (Article XIII D), which undertakes to constrain the imposition by local governments of "assessments, fees and charges." (Art. XIII D, § 1.) An "[a]ssessment" is "any levy or charge upon real property by an agency for a special benefit conferred upon the real property." (Art. XIII D, § 2, subd. (b).) "Special benefit" means "a particular and distinct benefit over and above general benefits conferred on real property located in the district or to the public at large." (Art. XIII D, § 2, subd. (i).) "Fee" and "charge" are defined interchangeably as "any levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service." (Art. XIII D, § 2, subd. (e).)

---

[10] This use of the term "special purpose district" illustrates the questionable draftsmanship that pervades the measure, for while it contains a definition for "special district" (Art. XIII C, § 1, subd. (c)), it does not define the phrase "special purpose district."

Article XIII D imposes procedural requirements on the levying of assessments, including a noticed public hearing and balloting of all affected landowners, who may veto the assessment by a majority negative vote, determined in proportion to the proposed assessment on each property. (Art. XIII D, § 4, subds. (c)–(e).) A "[p]roperty [r]elated [f]ee[] [or] [c]harge[]" may only be imposed or increased after identification of affected parcels, notice to their owners, a public hearing an opportunity for protest, and with certain exceptions, approval by a majority of property owners or by two thirds of voters within the district. (Art. XIII D, § 6.)

It is undisputed that the Agency did not comply with the procedures prescribed under Propositions 62 and 218 for general taxes, special taxes, assessments, or property-related charges. Therefore, if the groundwater augmentation charge falls within any of these categories, it must be invalidated.

B. *Special Tax*

There is no question that if the charge here is a "tax," it is a special tax. Objectors argue that it is precisely that. They cite Proposition 218's definition of a "[s]pecial tax" as a "tax imposed for specific purposes . . . ." (Art. XIII C, § 1, subd. (d); Gov. Code, § 53721 [to same effect].) They thus focus on the *benefit* to be derived from the charge and its relationship to the manner in which the charge is *distributed.* In essence they contend that, with the exception of coastal farmers who will receive imported water, those paying the charge will receive no benefit beyond that enjoyed by the general public. In Objectors' view, this makes the charge a tax, not a fee. The Agency focuses on the relationship between the *amount* of the charge and the *cost* of the services it is earmarked to finance, contending that since the charge does not exceed the costs of groundwater remediation, it is not a tax.

We need not choose between these methodologies because they both beg the question whether the charge is a "tax" at all. It is evident on the face of Propositions 62 and 218 that not all charges are taxes. Proposition 218 classifies regulated public levies into four categories: general taxes, special taxes, assessments, and property-related charges. Objectors' concern with the "special" or "general" nature of the benefit to be financed by the groundwater augmentation charge appears to have little bearing on whether the charge is a tax in the first instance.

Objectors cite several cases in connection with their contention that the charge here is a tax, but none supports the conclusion they seek. In *Howard Jarvis Taxpayers Assn. v. City of Roseville* (2003) 106 Cal.App.4th 1178, 1182 [132 Cal.Rptr.2d 1], the court considered a local ballot measure that sought to

ratify a preexisting "utility user's tax" and to earmark its proceeds for police, fire, parks, recreation, or library services. There was no question about the charge's status as a "tax"; the only question was whether it was a "general tax," that could be imposed by a majority of the voters, or a "special tax," requiring a two-thirds vote. (See *id.* at pp. 1183–1184, 1186.) In *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 232 [45 Cal.Rptr.2d 207, 902 P.2d 225], the court held, unremarkably, that a sales tax earmarked for transportation projects was a " 'special tax' " subject to the two-thirds requirement. Indeed the point was scarcely contested; the only real issue was whether the taxing authority was a " 'district' " for purposes of Government Code section 53722. (*Santa Clara County Local Transportation Authority v. Guardino, supra,* 11 Cal.4th at pp. 232–233.) In *San Marcos Water Dist. v. San Marcos Unified School Dist.* (1986) 42 Cal.3d 154, 158, 165, 168 [228 Cal.Rptr. 47, 720 P.2d 935], the court held that a one-time "sewer capacity fee" was a "special assessment" for purposes of a rule exempting publicly entities from paying such assessments, rather than a "user fee" which such an entity could be required to pay. In *Isaac v. City of Los Angeles* (1998) 66 Cal.App.4th 586, 597 [77 Cal.Rptr.2d 752], the court held that a "utility lien" imposed by a city to aid in collecting unpaid utility charges was not a special tax, special assessment, regulatory fee, or development fee, but "[a]t most . . . a user fee . . . ."

The only factually similar case appears to be *Orange County Water Dist. v. Farnsworth* (1956) 138 Cal.App.2d 518, 522 [292 P.2d 927], which considered the validity of a "replenishment assessment" charged by a water district to purchase water "for the purpose of replenishing the underground water supplies of said district . . . ." According to Objectors, "*Farnsworth* held that 'the charge in question is in the nature of an excise tax levied upon the activity of producing ground water by pumping operations.' " This critically misquotes the court, which in fact said that the charge was "*more* in the nature of an excise tax" than it was an ad valorem property tax or a special assessment. (*Id.* at p. 530, italics added.) The court went on to note the sui generis quality of the charge and to declare that this alone could not render it unconstitutional: "As was said in *County of Ventura v. So. Cal. Edison Co.* [(1948)] 85 Cal.App.2d 529 [193 P.2d 512] . . . , 'A holding that legislation is constitutionally invalid . . . cannot be founded upon a mere difficulty of categorization, but rather must be based upon a clear, substantial, and irreconcilable conflict with the fundamental law.' " (*Ibid.*) The court's allusion to an excise tax is understandable given the state of the law at that time; according to our electronic research, no published California decision prior to the issuance of that opinion had ever used the phrase "user fee." In the wake of Proposition 13 and its progeny, a veritable riot of new jurisprudence has developed around these issues. The court's describing the fee there as "more

in the nature of an excise tax" hardly compels adoption of Objectors' position here. (*Orange County Water Dist. v. Farnsworth, supra,* 138 Cal.App.2d at p. 530.)

■ Under modern law, the central distinction between a tax and a fee appears to be that a tax is "imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted. [Citations.]" (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874 [64 Cal.Rptr.2d 447, 937 P.2d 1350]; see *Barratt American Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 700 [37 Cal.Rptr.3d 149, 124 P.3d 719].) The augmentation charge here exposes the falseness of this supposed dichotomy. While it is intended to finance improvements, and thus to raise "revenue," it is also charged in return for the benefit of ongoing groundwater extraction and the service of securing the water supply for everyone in the basin.[11] Indeed, if not for the prohibitive cost of metering smaller wells, which necessitates charging those extractors on the basis of estimated usage, the fee might well be justified on regulatory grounds, as bringing the actual cost of groundwater nearer its true replacement cost and thus subjecting it to the regulation of the marketplace. This rationale might still be readily invoked with respect to metered extractions and perhaps those estimated based upon particular facts such as the nature of crops grown. In any event we are far from persuaded that the charge can be characterized as a "tax."

### C. *Special Assessment*

Objectors contend that if the groundwater augmentation charge is not a tax it is a "special assessment." But Proposition 218 defines an "assessment" as a "levy or charge *upon real property* . . . ." (Art. XIII D, § 2, subd. (b), italics added.) This reflects the central characteristic of a "special assessment" as a charge *on land.* Thus in *Trumbo v. Crestline Lake Arrowhead Water Agency* (1967) 250 Cal.App.2d 320 [58 Cal.Rptr. 538], a "standby water charge" assessed by a water agency against certain properties whether or not water was used constituted not a tax but a "special assessment to be levied upon land according to the availability of water." (*Id.* at. p. 322.)

■ The augmentation charge is not a charge "upon real property," but one upon an activity—the extraction of groundwater. It is imposed under the authority of article 10, section 1001 of the Act, which provides that the Agency "may, by ordinance, levy groundwater augmentation charges *on the*

---

[11] Although the Agency does not appear to argue the point, it might be suggested that the augmentation charge operates in part to secure the "privilege" of avoiding more draconian measures, such as dramatic adjudicated reductions in permitted extractions. The Legislature has granted the Agency broad powers to restrict or suspend extractions if that becomes necessary to carry out its functions. (See Stats. 1984, ch. 257, §§ 712–714, pp. 811–812.)

*extraction of groundwater·from all extraction facilities* within the agency for the purposes of paying the costs of purchasing, capturing, storing, and distributing supplemental water for use within the boundaries of the agency." (Stats. 1984, ch. 257, § 1001, p. 815, italics added.) This stands in contrast to the authority granted the Agency to *"fix charges upon land* within the agency for the purpose of paying the costs of initiating, carrying on, and completing any of the powers, projects, and purposes for which the agency is organized." (Stats. 1984, ch. 257, § 902, p. 814, italics added.) The latter provision arguably contemplates an "assessment" as defined in Article XIII D, section 2, subdivision (b). The former does not; rather it contemplates a charge for an activity, to wit, the extraction of groundwater. (Stats. 1984, ch. 257, § 1001, p. 815.) In adopting the ordinance here at issue, the Agency was manifestly acting under this statute and not under the statute authorizing charges on land.

The nature of an assessment as a charge on land is commonly reflected in its being *secured by a lien* on the charged property. (See Gov. Code, § 53931 ["All special assessments in which the amount thereof is apportioned among the several parcels of land assessed shall constitute a lien in said respective amounts upon the several parcels assessed . . . ."]; Gov. Code, § 54718, subd. (a) [stating circumstances under which benefit assessment will not give rise to lien, but will be "transferred to the unsecured roll"]; Civ. Code, § 2911 [duration of liens, including those "to secure the payment of a public improvement assessment"].) In contrast to these provisions and to enforcement mechanisms for other charges, as discussed more fully in the following section, the augmentation charge is not secured by real property. As discussed more fully below, the charge differs from many other levies in that no mechanism exists for reducing delinquent payments to a lien short of filing suit, obtaining a judgment, and executing the judgment on real property belonging to the debtor—a remedy available to any creditor. (See Stats. 1984, ch. 257, § 1004, p. 816; Wat. Code, § 75630 et seq.; Pajaro Valley Groundwater Agency Ord. No. 2003-01, § 6.03.)

Objectors contend that whatever its intentions, the Agency in fact assessed the augmentation charge on real property because (1) it identified the presumptive owners and operators of wells by consulting parcel tax records to determine who owned the land on which wells were situated; and (2) in at least some cases the Agency billed these owners through county taxing authorities, who included augmentation charges with their property tax mailings. Neither of these facts establishes that the charge was assessed on real property.

The Agency's manager testified in essence that tax rolls were a convenient and reliable means of identifying the person responsible for extraction on the assumption that this was likely to be the owner of the land on which

extraction was occurring. The fact that property owners are presumed to be the operators and beneficiaries of wells situated on their premises does not convert a charge based on conduct into one assessed against land. The situation may be analogized to one in which an automobile is operated in a manner constituting a toll violation under Vehicle Code section 40250 et sequitur. In general, the vehicle's owner is jointly liable with its operator unless he can show that the vehicle was used without his consent. (Veh. Code, § 40250, subd. (b).) This does not convert the resulting fine into a vehicle registration fee. It remains a charge based upon *conduct*. It is assessed against the person most likely to be responsible for and to have control over the conduct, on the supposition that if he or she is not primarily responsible, he or she can obtain recompense from those who are. (See Veh. Code, § 40250, subd. (b) ["Any person who pays any toll evasion penalty, civil judgment, costs, or administrative fees pursuant to this article shall have the right to recover the same from the driver, rentee, or lessee"].) Here Agency witnesses testified that when a well was shown to be operated by a lessee or other occupant, that person could be billed; the Agency had even entered into payment arrangements with lessees in lieu of collection proceedings. We have never heard of a county tax collector who was willing to look to anyone other than the record owner for payment of property taxes or assessments. The Agency's willingness to do so here lends strong support to its contention that the augmentation charge is in fact and in law an activities-related charge and not a property assessment.

Nor does the former inclusion of augmentation charges with tax bills lead to a different conclusion. The Agency's manager testified that prior to 2003, some or all extractors had been billed for augmentation charges along with their property taxes. In 2003, however, the Agency adopted two ordinances "rescinding" this practice after receiving a letter from the office of the Santa Cruz County Counsel expressing the view that "it was inappropriate to be using the tax rolls for the collection of the augmentation charge." The practice would apparently continue only with respect to the Agency's property management fee, which is not at issue here, and which the manager acknowledged to be "a property related fee" intended to fund administrative expenses.

██ Objectors argued below that the Agency's practice of including the bill for groundwater augmentation with county property tax bills gave rise to an estoppel. On appeal Objectors appear to have abandoned this argument, which lacked substance in any event. In their brief below Objectors quoted some very general statements about the availability of estoppel against public entities, but made no attempt to establish the presence of the actual *elements* of that doctrine. As the cited source notes, the essential ingredient of an estoppel is *detrimental reliance on misleading words or acts*. (13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 191, pp. 527–528.) In other

words, the person asserting the estoppel must have been *induced to act* by some deceptive or inequitable statement or conduct on the part of the person to be estopped. Objectors have never suggested any way in which they or others were misled to their injury by the Agency's conduct in this or any other respect.

Objectors also argue that the charge must be a property assessment because it is a "capacity charge." As noted in part I, *ante*, Objectors argue in a different context that the charge is only partly a "capacity charge." Here they seem to imply that it is entirely a capacity charge, which in turn makes it a special assessment. We reject the notion that problems of this kind can be usefully addressed using this sort of lightfooted taxonomical reasoning. In any event it is flatly untrue that capacity charges are always or even "usually," as Objectors assert, special assessments for purposes of Proposition 218. Both of the cases cited by Objectors concerned the classification of certain *utility charges* as "special assessments" for purposes entirely foreign to the present controversy. (*Utility Cost Management v. Indian Wells Valley Water Dist.* (2001) 26 Cal.4th 1185 [114 Cal.Rptr.2d 459, 36 P.3d 2]; *California Psychiatric Transitions, Inc. v. Delhi County Water Dist.* (2003) 111 Cal.App.4th 1156 [4 Cal.Rptr.3d 503].) As the California Supreme Court has acknowledged with respect to a case central to both of those decisions, the application of the term "assessment" in other contexts is of little value in discerning its correct application in the present context. (*Richmond v. Shasta Community Services Dist.* (2004) 32 Cal.4th 409, 422 [9 Cal.Rptr.3d 121, 83 P.3d 518] (*Richmond*), distinguishing *San Marcos Water Dist. v. San Marcos Unified School Dist., supra*, 42 Cal.3d 154.) In the present setting, as previously noted, the term "assessment" (or "special assessment") intrinsically implies a charge *on real estate*. (See Art. XIII D, § 2, subd. (b).) In contrast, "[t]he characteristic that [the Supreme Court] found determinative for identifying assessments in *San Marcos*—that the proceeds of the fee were used for capital improvements—forms no part of article XIII D's definition of assessments. . . . *San Marcos* is not helpful, much less controlling, in this strikingly different context." (*Richmond, supra*, 32 Cal.4th at p. 422.)

We conclude that the augmentation charge was not a property assessment.

### D. Charge Incidental to Property Ownership

 The most difficult of the issues raised by Objectors is whether the augmentation charge falls within the provisions of Proposition 218 restricting the power of public agencies to impose a " '[f]ee' or 'charge,' " defined as any "levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or *upon a person as an incident of property ownership*, including a user fee or charge for a property related

service." (Art. XIII D, § 2, subd. (e), italics added.) The phrase "[p]roperty-related service" is defined to mean "a public service having a direct relationship to property ownership." (Art. XIII D, § 2, subd. (h).) "Property ownership" is defined to "include tenancies of real property where tenants are directly liable to pay the assessment, fee, or charge in question." (Art. XIII D, § 2, subd. (g).)

Where a proposed fee or charge comes within this definition, Article XIII D requires the proposing agency to identify parcels upon which it will be imposed, and to conduct a public hearing. (Art. XIII D, § 6, subd. (a)(1).) The hearing must be preceded by written notice to affected owners setting forth, among other things, a "calculat[ion]" of "[t]he amount of the fee or charge proposed to be imposed upon each parcel . . . ." (*Ibid.*) If a majority of affected owners file written protests at the public hearing, "the agency shall not impose the fee or charge." (Art. XIII D, § 6, subd. (a)(2).) Moreover, unless the charge is for "sewer, water, [or] refuse collection services," "no property related fee or charge shall be imposed or increased unless and [it] is submitted and approved by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area." (Art. XIII D, § 6, subd. (c).) Proposition 218 also imposes substantive limitations, including restrictions on the use of revenues derived from such charges. (Art. XIII D, § 6, subd. (b).)

Objectors contend that the groundwater augmentation fee is subject to these requirements and that, because the Agency did not comply with them, it is invalid. In our original decision, we concluded that the charge is not "imposed . . . as an incident of property ownership" (Art. XIII D, § 2, subd. (e)) because it is imposed not on property owners as such, or even well owners as such, but on persons *extracting groundwater* from the basin. We acknowledged that the Agency considers the landowner ultimately responsible, but noted that the charge had sometimes been billed to, and collected from, tenants. Relying primarily upon *Richmond, supra,* 32 Cal.4th 409, and *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830 [102 Cal.Rptr.2d 719, 14 P.3d 930] (*Apartment Association*), we reasoned that the charge was not incidental to property ownership because (1) it was incurred only through voluntary action, i.e., the pumping of groundwater, and could be mitigated or avoided altogether by refraining from that activity; (2) it would never be possible for the Agency to comply with Article XIII D's requirement that it calculate in advance the amount to be

charged on a given well; and (3) the charge burdens those on whom it is imposed not as landowners but as water extractors.[12]

We have been compelled to reexamine this rationale, and ultimately to abandon it, in light of *Bighorn, supra,* 39 Cal.4th 205. At issue there was the validity of a proposed initiative reducing certain charges by a water agency. In the portion of the opinion relevant here, the question was whether the charges constituted "fee[s] or charge[s]" subject to the power guaranteed to voters by Article XIII C, section 3, to "reduc[e] or repeal[]," by initiative, "any local tax, assessment, fee or charge." The court did not attempt to determine the precise outlines of the class of fees and charges covered by Article XIII C, because it reasoned that (1) any fee or charge falling within Article XIII D necessarily came within Article XIII C as well; (2) the charges at issue all fell within Article XIII D; (3) the charges therefore fell within Article XIII C and were subject to the initiative power.[13] (*Bighorn, supra,* 39 Cal.4th at pp. 215–216.)

The point critical to our inquiry is the second one, i.e., that the charges came within Article XIII D. The court cited *Richmond* for the proposition that "a public water agency's charges for ongoing water delivery . . . are fees and charges within the meaning of article XIII D." (*Bighorn, supra,* 39 Cal.4th at p. 216, citing *Richmond, supra,* 32 Cal.4th at pp. 426–427.) The court quoted at length a passage in *Richmond* where it explained its "agree[ment]" with the challengers that "supplying water is a 'property-related service' within the meaning of article XIII D's definition of a fee or charge. . . ." (*Richmond, supra,* 32 Cal.4th at p. 426; see *Bighorn, supra,* 39 Cal.4th at pp. 214–215.) The quoted passage opens with the Legislative Analyst's explicitly tentative opinion, as stated in the ballot pamphlet containing Proposition 218, that "[f]ees for water, sewer, and refuse collection service probably meet the measure's definition of a property-related fee." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) analysis of Prop. 218 by Legis. Analyst, p. 73; *Richmond, supra,* at p. 426.) The court attributed this opinion to the Legislative Analyst's "apparent[] conclu[sion]" that "water service has a direct relationship to property ownership, and thus is a property-related service within the

---

[12] We also placed considerable reliance on *Howard Jarvis Taxpayers Assn. v. City of Los Angeles* (2000) 85 Cal.App.4th 79, 83 [101 Cal.Rptr.2d 905], which rejected a contention that water rates "based primarily on the amount consumed" were subject to Proposition 218. The Supreme Court disapproved that decision in *Bighorn* insofar as it is inconsistent with the court's conclusion that "all charges for water delivery" incurred after a water connection is made "are charges for a property-related service, whether the charge is calculated on the basis of consumption or is imposed as a fixed monthly fee." (*Bighorn, supra,* 39 Cal.4th at p. 217, fn. 5, and accompanying text.)

[13] The court nonetheless held the initiative invalid because it attempted to impose certain voter approval requirements on future rate increases that the court held beyond the proper scope of a local initiative. (*Bighorn, supra,* 39 Cal.4th at pp. 221–222.)

meaning of article XIII D because water is indispensable to most uses of real property; because water is provided through pipes that are physically connected to the property; and because a water provider may, by recording a certificate, obtain a lien on the property for the amount of any delinquent service charges (see Gov. Code, §§ 61621, 61621.3)." (*Richmond, supra,* 32 Cal.4th at pp. 426–427.)

The *Richmond* court found support for this imputed conclusion in "several provisions" of Article XIII D, of which it cited two: (1) the declaration that "fees for the provision of electrical or gas service shall not be deemed charges or fees imposed as an incident of property ownership" (Art. XIII D, § 3, subd. (b)); and (2) the exemption of "fees or charges for sewer, water, and refuse collection services" from the voter approval requirements otherwise imposed by Article XIII D on covered fees and charges (Art. XIII D, § 6, subd. (c)). Accordingly, the court "agree[d]," some "water service fees, being fees for property-related services, may be fees or charges within the meaning of article XIII D." (*Richmond, supra,* 32 Cal.4th at p. 427.) However, the court acknowledged, a fee will fall within the provisions of that measure "if, but only if, it is imposed 'upon a person as an incident of property ownership.' " (*Ibid.,* quoting Art. XIII D, § 2, subd. (e).) The court then issued the pronouncement of greatest relevance here: "A fee for ongoing water service through an existing connection is imposed 'as an incident of property ownership' because it requires nothing other than normal ownership and use of property. But a fee for making a new connection to the system is not imposed 'as an incident of property ownership' because it results from the owner's voluntary decision to apply for the connection." (*Richmond, supra,* 32 Cal.4th at p. 427.) The court reiterated that Proposition 218 should not be read to absolutely prohibit new connection fees, an effect 'it would have if agencies were compelled to comply with its requirement that they identify and give notice to those on whom the fee is to be imposed. (*Richmond, supra,* 32 Cal.4th at pp. 427–428.)

In our original opinion we reasoned that in holding ongoing service fees to be within the purview of Article XIII D, the *Richmond* court must have been speaking of *flat fees,* as opposed to those based on the amount of water (or similar commodity) consumed. Otherwise, it seemed to us, its rationale for holding the connection fee outside of Article XIII D would apply with equal force to ongoing service fees. Where a fee is predicated on *consumption* it may be impossible to predict who will actually incur the fee, because not everyone will necessarily use the service.[14] Moreover, it quite probably *will*

---

[14] Elsewhere in the opinion the court itself implicitly acknowledged the voluntary nature of water consumption when it pointed out that not all new service connections will necessarily be associated with new development, because "a property owner may request a new service connection without proposing any new development, such as when the owner of a previously

be impossible to predict the *quantity* to be consumed, and thus to forecast the precise "amount of the fee or charge proposed to be imposed," as is required by Article XIII D, section 6, subdivision (a)(1).[15] Further, a consumption-based fee would be incurred only through the occupant's "voluntary decision" to consume water delivered by the provider. The occupant has at least the theoretical alternative of securing water elsewhere, or not using it at all. We therefore applied *Richmond*'s analysis of the connection fee to the Agency's consumption-based groundwater augmentation charge, concluding that the latter, like the former, falls outside Article XIII D.

■ In *Bighorn, supra,* 39 Cal.4th 205, the court flatly rejected the view that consumption-based delivery fees are beyond the reach of Article XIII D. What had begun in *Richmond* as a tentative surmise attributed to the Legislative Analyst now ripened into a broad categorical rule: "As we explained in *Richmond, supra,* 32 Cal.4th 409, domestic water delivery through a pipeline is a property-related service within the meaning of this definition. (*Id.* at pp. 426–427.) Accordingly, once a property owner or resident has paid the connection charges and has become a customer of a public water agency, all charges for water delivery incurred thereafter are charges for a property-related service, whether the charge is calculated on the basis of consumption or is imposed as a fixed monthly fee. Consumption-based water delivery charges also fall within the definition of user fees, which are 'amounts charged to a person using a service where the amount of the charge is generally related to the value of the services provided.' (*Utility Audit Co., Inc. v. City of Los Angeles* (2003) 112 Cal.App.4th 950, 957 [5 Cal.Rptr.3d 520].) Because it is imposed for the property-related service of water delivery, the Agency's water rate, as well as its fixed monthly charges, are fees or charges within the meaning of article XIII D . . . ." (*Bighorn,* at p. 217, fn. omitted.)

It would appear that the only question left for us by *Bighorn* is whether the charge on groundwater extraction at issue here differs materially, for purposes of Article XIII D's restrictions on fees and charges, from a charge on

developed residential parcel *decides to use the District's water instead of water from an existing well* on the property." (*Richmond, supra,* 32 Cal.4th at pp. 424–425, italics added.) Of course, any occupant in a position to make such a choice is at least theoretically in a position to *stop* using the District's water and return to the existing well. Such an occupant is certainly acting "voluntarily" when he elects to use delivered water.

[15] We assumed that the drafters of Article XIII D used the term "amount," in deliberate contradistinction to "rate," to mean the actual *sum* to be charged to the owner of a given property. Unlike a rate, a consumption-driven charge cannot be determined until the amount consumed is known, i.e., after the fact. The holding in *Bighorn* appears incompatible with this view, compelling the conclusion that the notice requirements of Article XIII D are satisfied if the agency apprises the owner of the proposed *rate* to be charged. Otherwise, the court's distinction between connection fees and ongoing service charges appears difficult, if not impossible, to defend.

*delivered* water. We have failed to identify any distinction sufficient to justify a different result, and the Agency points us to none. The Agency contends that the charge is not a "service fee," but that proposition seems beside the point if the charge is imposed as an incident of property ownership. The Agency's only argument on this point appears to be that the charge resembles those upheld by the Supreme Court in a still earlier decision, *Apartment Association, supra*, 24 Cal.4th 830. In that case the court held that an "inspection fee" charged to residential landlords was *not* subject to the provisions of Article XIII D. That measure, wrote Justice Mosk, "only restricts fees imposed directly on property owners in their capacity as such," whereas the fee there was imposed not because "a person owns property," but "because the property is being rented." (*Apartment Association, supra*, 24 Cal.4th at p. 838.) He noted that the fee "ceases along with the business operation, whether or not ownership remains in the same hands." (*Ibid.*) He reasoned that the fee was "imposed on landlords not in their capacity as landowners, but in their capacity as business owners." (*Id.* at p. 840.) Comparing the fee to one charged for a business license, Justice Mosk wrote that "[i]t is imposed only on those landowners who choose to engage in the residential rental business, and only while they are operating the business." (*Ibid.*) Proposition 218, he continued, governs "taxes, assessments, fees, and charges . . . when they burden landowners *as landowners*. The ordinance . . . imposes a fee on its subjects by virtue of their ownership of a business—i.e., because they are landlords. What plaintiffs ask us to do is to alter the foregoing language—changing 'as an incident of property ownership' to 'on an incident of property ownership.' But to do so would be to ignore its plain meaning—namely, that it applies only to exactions levied solely by virtue of property ownership." (*Id.* at p. 842, fn. omitted.)

As we noted in our prior opinion, the Supreme Court cited *Apartment Association* with apparent approval in *Richmond, supra*, 32 Cal.4th at pages 414–415. In *Bighorn*, however, it did not mention the case at all, even though it seems highly relevant to the question whether monthly delivery charges, and especially consumption-based charges, fall within Article XIII D. This omission raises questions about the reach, if not the vitality, of *Apartment Association*. The juxtaposition of that decision with *Bighorn* suggests the possibility that a fee falls outside Article XIII D to the extent it is charged for consumption of a public service for purposes or in quantities exceeding what is required for basic (i.e., residential) use of the property. In *Richmond* and *Bighorn* the court was clearly concerned only with charges for water for "domestic" use. (See *Bighorn, supra*, 39 Cal.4th at p. 217, italics added ["As we explained in *Richmond* . . . , *domestic* water delivery through a pipeline is a property-related service within the meaning of this definition"].) This leaves open the possibility that delivery of water for *irrigation* or other nonresidential purposes is not a property-based service, and that charges for it

are not incidental to the ownership of property.[16] A finding that such a fee is not imposed as an incident of property ownership might be further supported by a clearly established regulatory purpose, e.g., to internalize the costs of the burdened activity or to conserve a supplied resource by structuring the fee in a manner intended to deter waste and encourage efficiency.

We need not decide the soundness of these theories in the wake of *Bighorn*, because they cannot sustain the charge before us in any event. The charge is assessed on all persons extracting water, a large majority of whom are using it for residential or domestic purposes. Therefore even if a charge on nonresidential uses would fall outside the rationale of *Bighorn*, the present charge does not. Further, even if a predominantly regulatory purpose would save the charge, it is difficult to see how it might do so here, where the majority of users are charged on the basis not of actual but of estimated or presumptive use. Thus, while the augmentation charge may have some tendency to inhibit consumption and provide an incentive for efficient use *by metered users*, it can have little if any effect on the residential users who make up the majority of persons paying it. Nor is there any attempt to graduate the charge to further discourage the most intensive uses and encourage conversion to less intensive ones.[17]

Similarly, assuming *Apartment Association*'s capacity-based analysis retains vitality, we fail to see how it can validate the augmentation charge here. The charge is imposed not only on persons using water in a business capacity but also on those using water for purely domestic purposes. The extension of the charge to domestic wells cannot be attributed to unavoidable regulatory overbreadth. The Agency appears to have a good idea of who is extracting water for residential purposes and who is extracting it for irrigation purposes. Under *Bighorn*, a homeowner or tenant who uses extracted water for bathing, drinking, and other domestic purposes cannot be compared to a businessman who, as described in *Apartment Association*, elects to go into the residential landlord business.

In our previous opinion we adopted the view that one who incurred the charge did so not in the capacity of landowner, but in that of water user. We do not believe this view can be reconciled with *Bighorn* where the court held

---

[16] Objectors have not suggested that a charge on water *imported* for irrigation or other nondomestic purposes would fall within Proposition 218.

[17] Indeed, the Agency all but concedes that the charge is not truly "regulatory," ultimately sidestepping the point by attacking the straw-man premise that the fee is only brought within Article XIII D by its consumption-based nature. We agree that a given fee does not become incidental to property ownership merely because it is based on consumption. No one has suggested that it does. The court in *Bighorn* held only that if a fee is otherwise incidental to ownership, its assessment based on consumption does not ipso facto take it outside of Article XIII D.

water delivery fees to be imposed as an incident of property ownership, whether or not based on usage, even though it might have been argued under *Apartment Association* that affected persons incurred delivery charges not as owners but as voluntary consumers of water.[18]

Moreover the charge here is not actually predicated upon the *use* of water but on its *extraction*, an activity in some ways more intimately connected with property ownership than is the mere receipt of delivered water. The precise nature of a property owner's interest in underlying groundwater, and whether it constitutes a kind of real property ownership, is an esoteric and nuanced subject. (See Wat. Code, § 102 ["All water within the State is the property of the people of the State, but the right to the use of water may be acquired by appropriation in the manner provided by law"]; cf. *State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1030 [93 Cal.Rptr.2d 276], fn. omitted ["the State's power under the Water Code is the power to control and regulate use; such a power is distinct from the concept of 'ownership' as used in the Civil Code and in common usage"]; *Joslin v. Marin Municipal Water Dist.* (1967) 67 Cal.2d 132, 149 [60 Cal.Rptr. 377, 429 P.2d 889] [claim by purported riparian owners to unreasonable use of creek waters "does not constitute a compensable property right" when interfered with by appropriative user]; see generally Rossmann & Steel, *Forging the New Water Law: Public Regulation of "Proprietary" Groundwater Rights* (1982) 33 Hastings L.J. 903.) There appears to be no doubt, however, that an overlying owner possesses "special rights" to the reasonable use of groundwater under his land. (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1237, fn. 7 [99 Cal.Rptr.2d 294, 5 P.3d 853].) These rights are said to be "based on the ownership of the land and . . . appurtenant thereto." (*California Water Service Co. v. Edward Sidebotham & Son* (1964) 224 Cal.App.2d 715, 725 [37 Cal.Rptr. 1]; see *Tehachapi-Cummings County Water Dist. v. Armstrong* (1975) 49 Cal.App.3d 992, 1001–1002 [122 Cal.Rptr. 918].) Thus, even if an overlying landowner does not strictly "own" the water under his land, his extraction of that water (or its extraction by his tenant) represents an exercise of rights derived from

---

[18] We continue to believe that the distinction is far from frivolous. A charge may be imposed on a person because he *owns* land, or it may be imposed because he *engages in certain activity* on his land. A charge of the former type is manifestly imposed as an incident of property ownership. A charge of the latter may not be. This appears to be the distinction Justice Mosk sought to articulate for the court in *Apartment Association*. We doubt that it is satisfactorily captured by a distinction between business and domestic uses or purposes. For example, a water conservation agency might assess a charge on the filling of swimming pools both to defray the cost of the water so used and to inhibit what it might view as a wasteful use. Such a use might be characterized as "domestic," but it is far from self-evident that a charge on it would be incidental to the ownership of property, or to the provision of a property-related service.

his ownership of land. In that respect a charge imposed on that activity is at least as closely connected to the ownership of property as is a charge on delivered water.

As against these factors tending to show that the charge is incidental to property ownership as that concept is elaborated in *Bighorn* and *Richmond*, only one feature cited by the Supreme Court appears to be lacking. In both of those cases the court alluded to the fact that the agencies there could, "by recording a certificate, *obtain a lien* on the property for the amount of any delinquent service charges (see Gov. Code, §§ 61621, 61621.3). . . ." (*Richmond, supra*, 32 Cal.4th at pp. 426–427, italics added; *Bighorn, supra*, 39 Cal.4th at p. 214.) The cited provisions of the Government Code, which have since been repealed and reenacted elsewhere, authorize community service districts to adopt various collection mechanisms, including the recordation of a certificate of arrearage, which automatically constitutes a lien. (See Gov. Code, § 61115, subd. (c).) Such a mechanism supports the conclusion that the charge is conceived as one directly on the real estate thus encumbered. However, the Agency is not a community services district, and thus is not authorized by these statutes to employ such a mechanism.[19] Nor do we find any authorization elsewhere for the Agency to unilaterally impose a lien based on an unpaid groundwater augmentation charge. The Act authorizes the Agency to collect interest on a delinquent charge and to "exercise any of the provisions of Article 5 (commencing with Section 75630) of Chapter 3 of Part 9 of Division 21 of the Water Code for the purpose of collecting delinquent groundwater charges." (Stats. 1984, ch. 257, § 1004, p. 816.) The cited provisions authorize the Agency to obtain, from a court, an injunction against operation of the offending "water-producing facility" (Wat. Code, § 75631; see *id.*, § 75630 [temporary restraining order]) and to bring a civil suit for delinquent charges, interest, and penalties (Wat. Code, § 75633). They do not grant the Agency a lien, or the power to impose a lien.[20] The Agency is thus relegated to the remedies available to any other

---

[19] A "community services district" is one created to provide any of a number of specified services. (See Gov. Code, § 61100.) The enumerated purposes include "[s]upply[ing] water for any beneficial uses, in the same manner as a municipal water district . . . ." (Gov. Code, § 61100, subd. (a).) They do not include groundwater management. (Gov. Code, § 61100.) Moreover, the formation of such a district originates with a petition by voters (Gov. Code, § 61011) or a "resolution of application" by a local legislative body or special district (Gov. Code, § 61013). The Agency was created by act of the California Legislature.

[20] Curiously, the Legislature has created an automatic lien for unpaid "groundwater extraction charge[s]" imposed by other, seemingly similar agencies, and has also authorized those agencies to collect such charges on the property tax rolls. (See Sierra Valley and Long Valley Groundwater Basins Act (Stats. 1983, ch. 1109, § 808, p. 4195, West's Ann. Wat.-Appen. (1995 ed.) ch. 119, § 119-808, pp. 514–515); Honey Lake Valley Groundwater Basin Act (Stats. 1989, ch. 1392, § 807, p. 6030, West's Ann. Wat.-Appen. (1995 ed.) ch. 129, § 129-807, p. 841); Willow Creek Valley Groundwater Basin Act (Stats. 1993, ch. 1181, § 807,

creditor. These may of course include reducing the debt to judgment and then obtaining a lien on the property as an aid in execution of the judgment. But this no more makes the charge incidental to property ownership than is a credit card debt.

■ While the automatic or summary creation of a lien for unpaid charges would tend to support a determination that a charge is imposed as an incident of property ownership, the failure to provide such a mechanism does not appear determinative here. In every other respect the charge appears as closely related to property ownership as the charges at issue in *Bighorn.* Indeed, in at least one respect—the nature of the right burdened by the charge—it appears more closely related. Given the *Bighorn* decision, and its reading of the *Richmond* decision, we see no basis to conclude that the charge here should be viewed any differently from the charges held to be incidental to property ownership there. We thus conclude that the groundwater augmentation charge is indeed imposed as an incident of property ownership, that it is subject to the restrictions imposed on such charges by Article XIII D, and that since the Agency did not conform to those restrictions the ordinance under review must be declared invalid.[21]

---

pp. 6764–6765, West's Ann. Wat.-Appen. (1995 ed.) ch. 135, § 135-807, p. 986; Surprise Valley Groundwater Basin Act (Stats. 1995, ch. 698, § 808, p. 5297, West's Ann. Wat.-Appen. (2007 supp.) ch. 137, § 137-808, p. 65.) The Agency is not alone, however, in being denied such collection powers. (See Fox Canyon Groundwater Management Agency Act (Stats. 1982, ch. 1023, §§ 1001-1008, pp. 3743–3744, West's Ann. Wat.-Appen. (1995 ed.) ch. 121, § 121-1001 et seq., p. 594 et seq.); Mono County Tri-Valley Groundwater Management District Act (Stats. 1989, ch. 844, § 903, p. 2781, West's Ann. Wat.-Appen. (1995 ed.) ch. 128, § 128-903, p. 818); Ojai Basin Groundwater Management Agency Act (Stats. 1991, ch. 750, § 1105, p. 3353, West's Ann. Wat.-Appen. (1995 ed.) ch. 131, § 131-1105, p. 887.) It might be argued that this difference in treatment implies a legislative intent *not* to make the particular charge before us an incident of property ownership. The point has not been addressed by the parties, however, and in the absence of a more concrete demonstration of legislative purpose, it appears too insubstantial to justify a divergence from the mandate of *Bighorn.*

[21] We should not be understood to imply that the charge is necessarily subject to *all* of the restrictions imposed by Article XIII D on charges incidental to property ownership. This case presents no occasion to determine whether this or a similar charge may fall within any of the express exemptions or partial exemptions set forth in that measure. (See, e.g., Art. XIII D, § 6, subd. (c) ["Except for . . . sewer, water, and refuse collection services, no property related fee or charge shall be imposed or increased unless and until that fee or charge is submitted and approved by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area"].)

DISPOSITION

The judgment is reversed.

Premo, J., concurred.

**BAMATTRE-MANOUKIAN, J.,** Concurring.—In 2003, the Pajaro Valley Water Management Agency (the Agency) passed an ordinance increasing a groundwater augmentation fee for all groundwater extractions within its boundaries. In this action by the Agency under Code of Civil Procedure section 860 to validate the ordinance, the trial court heard testimony and issued a comprehensive statement of decision setting forth its findings of fact and conclusions of law regarding the three issues argued below and raised again here on appeal: 1) whether jurisdiction was proper under Code of Civil Procedure section 860; 2) whether two members of the Agency's board of directors had disqualifying conflicts of interest; and 3) whether the augmentation charge was invalid for failure to comply with provisions of articles XIII C and XIII D of the California Constitution. The trial court decided all three issues in favor of the Agency and judgment was entered validating the ordinance.

I concur in the result the majority reaches, to reverse the judgment on the ground that the augmentation charge is subject to the provisions of article XIII D of the Constitution. I write separately for three reasons: First, I wish to emphasize the standards that guide and govern our review and that are the "threshold issue" in every appeal. (*Clothesrigger, Inc. v. GTE Corp.* (1987) 191 Cal.App.3d 605, 611 [236 Cal.Rptr. 605].) Second, I would address appellants' second argument—that the ordinance at issue was void due to disqualifying conflicts of interest of two members of the Agency's board—before reaching the constitutional issues. And last, as I wrote previously in my original concurrence in this case, I believe the question whether the augmentation charge at issue here was a fee imposed "as an incident of property ownership," within the meaning of the California Constitution, is a close and important issue. (Cal. Const., art. XIII D, § 2, subd. (e).) Our Supreme Court in *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205 [46 Cal.Rptr.3d 73, 138 P.3d 220] (*Bighorn*) has now provided further guidance in this area of the law, thus clarifying the views it expressed in *Richmond v. Shasta Community Services Dist.* (2004) 32 Cal.4th 409 [9 Cal.Rptr.3d 121, 83 P.3d 518] (*Richmond*). These two cases support the conclusion reached here, that the augmentation charge is a fee imposed "as an incident of property ownership," within the meaning of article XIII D of the Constitution.

As to the jurisdictional issue, the trial court made specific findings based on the evidence and supporting its conclusion that the augmentation charge was a capacity charge within the scope of Government Code section 66013, which made it a proper subject of a validation procedure under Code of Civil Procedure section 860. We defer to the trial court's findings resolving factual issues if supported by substantial evidence. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [80 Cal.Rptr.2d 378].) In addition, as the majority notes, the parties stipulated in the trial court that if any portion of the augmentation charge was found not to be within the jurisdiction of the court under Code of Civil Procedure section 860, the complaint would be deemed to be amended to include a declaratory relief cause of action, so that all issues relating to the augmentation charge could be addressed and preserved for appeal. I believe this record demonstrates that jurisdiction was proper.

Appellants next assert that a conflict of interest on the part of two of the Agency's board members disqualified them, rendering the ordinance null and void. Here again, the trial court made factual findings, based on the evidence at the hearing, and applied the relevant law, namely the Political Reform Act (Gov. Code, § 87100 et seq.) and the pertinent regulations (Cal. Code Regs., tit. 2, § 18700 et seq.). The trial court concluded that there was no disqualifying conflict of interest because the effect of the ordinance in question on the two directors was not distinguishable from its effect on the "public generally," as that exception is defined in the Government Code and the corresponding regulations. (See Gov. Code, § 87103; Cal. Code Regs., tit. 2, § 18707.2.) I believe this presents mixed questions of fact and law for our review. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800 [35 Cal.Rptr.2d 418, 883 P.2d 960].) Where the trial court has made factual determinations, such as those underlying the questions whether the financial burden and beneficial effect of the increased augmentation charge were "proportional," I believe we defer to those findings if they are supported by substantial evidence. To the extent that the court interpreted and applied the relevant statutes and regulations to the facts as found, or to those that were uncontroverted, we conduct independent review, as appellants contend. (See *Finnegan v. Schrader* (2001) 91 Cal.App.4th 572, 579 [110 Cal.Rptr.2d 552].)

Applying these rules, I would agree in general with the conclusions of the trial court: that the Agency is a "water, irrigation, or similar district" (Cal. Code Regs., tit. 2, § 18707.2, subd. (c)); that the evidence supported a finding that the augmentation charge is "applied on a proportional or 'across-the-board' basis on the official's economic interests and ten percent" of the affected property owners (Cal. Code Regs., tit. 2, § 18707.2, subd. (c)); that the evidence supported a finding that the "public generally" exceptions in the Political Reform Act and the regulations applied (Gov. Code, § 87103; Cal. Code Regs., tit. 2, § 18707.2, subds. (a) & (c)); and that the evidence

supported a finding that agriculture is a "predominant industry" throughout the Agency's district (Cal. Code Regs., tit. 2, § 18707.7, subd. (b)). Further, I would reject appellants' contentions that the regulations are in conflict with the statutory provisions in the Political Reform Act and that there was a common law conflict of interest. Therefore, based on the trial court's statement of decision, the record, and legal authority, and applying the relevant standards of review, I would find that the two directors did not have a disqualifying conflict of interest.

As to the constitutional issues, appellants contend that the question whether the augmentation charge complied with constitutional requirements is a question of law for this court to decide after independently reviewing the facts. I agree that as a general rule, we conduct de novo review when we are asked to interpret constitutional provisions and their application to a particular ordinance. (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874 [64 Cal.Rptr.2d 447, 937 P.2d 1350]; *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830 [102 Cal.Rptr.2d 719, 14 P.3d 930].) In the case before us, however, the trial court made findings based upon the evidence. To the extent that these are findings of fact, I believe we defer to the trial court's findings resolving disputed factual issues if they are supported by substantial evidence in the record. The application of the law to the undisputed facts, or to the facts as found, is then de novo.

As the majority points out, the key constitutional issue in this case is whether the augmentation charge is a property-related fee or charge subject to the requirements of article XIII D of the California Constitution. Section 2 of article XIII D defines a fee or charge as "any levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service." (Cal. Const., art. XIII D, § 2, subd. (e).) A "property-related service" is further defined as a service "having a direct relationship to property ownership." (*Id.* § 2, subd. (h).)

In *Richmond, supra,* 32 Cal.4th 409, the Supreme Court held that a capacity charge imposed as a condition of a new water hookup was not a charge "on real property as such," but was a charge against the individual for hooking up to water service. (*Id.* at p. 420.) It was therefore not a special assessment, which is a levy "upon real property." (Cal. Const., art. XIII D, § 2, subd. (b).) The court distinguished this from a fee or charge, which could be imposed either on the property itself or upon the owner " 'as an incident of property ownership.' " (*Richmond, supra,* 32 Cal.4th at p. 420, fn. 2.) The

court also addressed a fire suppression charge, which it found was not a fee imposed "as an incident of property ownership" because it was "not imposed simply by virtue of property ownership, but instead it is imposed as an incident of the voluntary act of the property owner in applying for a service connection." (*Id.* at p. 426.) The court explained that if the same fee were imposed as part of ongoing water service, it would be " 'an incident of property ownership' " because it would require "nothing other than normal ownership and use of property." (*Id.* at p. 427.) The court relied in part on the Legislative Analyst's conclusion, in the ballot materials for Proposition 218, that water service "is a property-related service within the meaning of article XIII D because water is indispensable to most uses of real property." (32 Cal.4th at p. 426.)

Recently in *Bighorn, supra,* 39 Cal.4th 205, the high court reaffirmed its reasoning in *Richmond,* finding that the water service charge at issue in *Bighorn* was a fee or charge within the meaning of article XIII D, and thus article XIII C, of the Constitution. Further, the court rejected an argument based on the distinction made in *Richmond,* namely that charges that are " 'consumption based' " do not come within the definition in article XIII D, because such charges involve a voluntary decision on the part of the water customer as to how much water to use. (*Bighorn, supra,* 39 Cal.4th at p. 216.) The court clarified that "once a property owner or resident has paid the connection charges and has become a customer of a public water agency, all charges for water delivery incurred thereafter are charges for a property-related service, whether the charge is calculated on the basis of consumption or is imposed as a fixed monthly fee." (*Id.* at p. 217.)

*Bighorn* thus addressed a concern I had previously expressed in a separate concurring opinion in this case. It appeared from the record here that the vast majority of property owners in the Pajaro Valley obtained their water from wells, and that alternative sources were not practically feasible. In these circumstances, I was concerned whether the continued use of this water should be characterized as part of the "normal ownership and use of property" (*Richmond, supra,* 32 Cal.4th at p. 427) rather than as a "voluntary act of the property owner." (*Id.* at p. 426.) *Bighorn* has resolved this issue. Under the authority of *Richmond* and *Bighorn,* and mindful of our role as an intermediate appellate court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), I conclude that the augmentation charge imposed by the ordinance here, even though it is a "consumption based" charge imposed per acre-foot for groundwater extractions within the Agency's boundaries, is a fee or charge imposed "as an incident of property ownership," within the meaning of article XIII D of the

California Constitution. The augmentation charge is thus subject to the restrictions and requirements of article XIII D, which concededly were not followed by the Agency. I would therefore reverse the judgment.

A petition for a rehearing was denied June 19, 2007, and respondent's petition for review by the Supreme Court was denied September 12, 2007, S153962.