Filed 4/15/15 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| CITY OF SAN BUENAVENTURA,<br><br>   Plaintiff, Cross-defendant and Appellant,<br><br>v.<br><br>UNITED WATER CONSERVATION DISTRICT et al.,<br><br>   Defendants, Cross-complainants and Appellants. | 2d Civil No. B251810<br>(Super. Ct. Nos. VENCI 00401714, VENCI 1414739)<br>(Santa Barbara County)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered the opinion filed on March 17, 2015, be modified as follows:

On page 6, in the last line of the first paragraph, the word "generally" is inserted before "prohibited by Proposition 13 altogether."

On page 8, in the last two lines of the second full paragraph, the word "two-thirds" is inserted before "majority of voters" and "subd. (b)" is replaced with "subd. (d)".

On page 26, in the fourth sentence of the last paragraph beginning with "Large-scale users such as the City receive a far greater benefit from individual landowners" the word "from" is replaced with "than".

[There is no change in the judgment.]

The City's petition for rehearing is denied.

Filed 3/17/15 (unmodified version)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| CITY OF SAN BUENAVENTURA, <br><br> Plaintiff, Cross-defendant and Appellant, <br><br> v. <br><br> UNITED WATER CONSERVATION DISTRICT et al., <br><br> Defendants, Cross-complainants and Appellants. | 2d Civil No. B251810 <br> (Super. Ct. Nos. VENCI 00401714, <br> VENCI 1414739) <br> (Santa Barbara County) |

Appellants United Water Conservation District and its board of directors (collectively, District) manage the groundwater resources in central Ventura County. Appellant City of San Buenaventura (City) pumps groundwater from District territory and sells it to residential customers. The District collects a fee from groundwater pumpers, including the City, based on the volume of water they pump. The Water Code authorizes this fee (Wat. Code, §§ 74508, 75522)[1] and requires the District to set different rates for different uses. Groundwater extracted for non-agricultural purposes must be charged at three to five times the rate applicable to water used for agricultural purposes. (§ 75594.)

---

[1] All statutory references are to the Water Code unless otherwise stated.

Article XIII D of the California Constitution governs fees "upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service." (Cal. Const., art. XIII D, §§ 1, 2, subd. (e).) The City contends that the fees it pays the District violate article XIII D because they "exceed the proportional cost of the service attributable to the parcel[s]" of land from which the City pumps its water. (*Id.* § 6, subd. (b)(3).)

The threshold question before us is whether the District's groundwater extraction charges are property-related and thus subject to article XIII D. The trial court, relying on *Pajaro Valley Water Management Agency v. Amrhein* (2007) 150 Cal.App.4th 1364 (*Pajaro*), concluded that they are. It found that the District's pumping charges violated article XIII D because, pursuant to section 75594, the District charged the City three times the rate it charged pumpers who extracted water for agricultural purposes. The court calculated the amount of overcharges in two separate years and issued writs of mandate requiring the District to refund these amounts to the City. The District appeals this decision, and the City cross-appeals, seeking declaratory relief that the trial court denied.

We conclude that the pumping fees paid by the City are not property-related and that *Pajaro* is distinguishable. We reject the City's alternative arguments. The pumping fees are not taxes subject to the requirements of article XIII C. In addition, substantial evidence supports the trial court's finding that the charges are valid regulatory fees because they are fair and reasonable, and do not exceed the District's resource management costs. Therefore, we reverse the judgment awarding relief to the City and direct the trial court to vacate its writs of mandate. Otherwise, we affirm.

BACKGROUND

I.

*Factual and Statutory Background*

The District is organized and operated pursuant to the Water Conservation District Law of 1931 (codified as amended in § 74000 et seq.). Its stated purpose is to "manage, protect, conserve and enhance the water resources of the Santa Clara River, its

2

tributaries and associated aquifers, in the most cost effective and environmentally balanced manner." To this end, the Water Code authorizes the District to conduct water resource investigations (§ 74520), acquire water and water rights (§ 74521), build facilities to store and recharge water (§ 74522), construct wells and pipelines for water deliveries (§ 74525), commence actions involving water rights and water use (§ 74641), prevent interference with or diminution of stream and river flows and their associated natural subterranean supply of water (§ 74642), and acquire and operate recreational facilities associated with dams and reservoirs (§ 74540).

The District covers approximately 214,000 acres in central Ventura County along the lower Santa Clara River valley and the Oxnard Plain. It comprises portions of several groundwater basins.[2] Along the Santa Clara River, from upstream to downstream, the District includes most or all of the Piru, Fillmore, Santa Paula, Oxnard Forebay, Oxnard Plain, and Mound basins. To the east of the Oxnard Plain basin, the District includes the West Las Posas basin and part of the Pleasant Valley basin.

Groundwater recharge in these basins occurs naturally from rainfall as well as from river and stream flow infiltration and percolation. Heavy demand for groundwater throughout the District from both agricultural and urban users causes overdraft, the amount by which extractions exceed natural water recharge. (See § 75506.) Artificial recharge is critical to minimize the overdraft. The District replenishes the groundwater supply directly by spreading diverted river water over grounds at the northern part of the Oxnard Plain. In addition, the District augments groundwater indirectly by delivering water through pipelines to users near the coast who would otherwise attempt to meet their water needs by pumping it from the ground. Despite these mitigation efforts, pumping in the District has exceeded recharge, both natural and artificial, by an average of 20,400 acre-feet per year over the past decade.

---

[2] A groundwater basin is "[a]n alluvial aquifer or a stacked series of alluvial aquifers with reasonably well-defined boundaries in a lateral direction and having a definable bottom." (Department of Water Resources, Bulletin 118-03, at p. 216.) An aquifer is "[a] body of rock or sediment that is sufficiently porous and permeable to store, transmit, and yield significant or economic quantities of groundwater to wells and springs." (*Id.* at p. 214.)

This has led to problems of subsidence and salt water intrusion into aquifers along the coast.

The District's water management activities and ongoing operating expenses require a means of funding. The District currently generates revenue from three main sources: property taxes (§ 75370), water delivery charges (§ 74592), and, at issue here, pump charges (§ 75522). Historically, the District relied solely on property taxes and water delivery charges. In 1979, after it had become clear that these two sources were insufficient to support the District's activities, particularly the reversal of overdraft and saline intrusion on the Oxnard Plain basin, the District began levying a charge on groundwater produced within its territory—i.e., pump charges.

The Water Code authorizes districts to impose pump charges in one or more zones within the district "for the benefit of all who rely directly or indirectly upon the ground water supplies." (§ 75522.) Zones may overlap and include the entire district (§ 75540), as does the District's Zone A, from which revenues are applied to a "general" fund used for District-wide conservation efforts. Although the rates charged may vary from zone to zone, the rate within each zone must be "fixed and uniform" for each of two classes of use—water used for agricultural purposes and water used for all other purposes. (§ 75594.) Subject to exceptions not at issue here, section 75594 prohibits a district from equalizing the rates charged for the two types of use.[3] Instead, the rate for non-agricultural use must be between three and five times that charged for agricultural use. The District has always set rates at the minimum 3:1 ratio.

In the 1980s and early 1990s, the District planned and constructed the Freeman Diversion project (Freeman), a major improvement to its surface water diversion facilities along the Santa Clara River near Saticoy. Freeman permanently diverted water from the Santa Clara River to recharge groundwater in the Oxnard Plain

_____

[3] Section 75594 provides in relevant part that "any ground water charge in any year shall be established at a fixed and uniform rate for each acre-foot for water other than agricultural water which is not less than three times nor more than five times the fixed and uniform rate established for agricultural water." The Water Code defines "agricultural water" to mean "water first used on lands in the production of plant crops or livestock for market." (§ 75508.)

4

basin in order to mitigate declining water levels and seawater intrusion. To help finance Freeman, the District imposed groundwater pumping charges in the area that it determined received the recharge benefit from Freeman. This area, designated as Zone B, currently comprises the basins south of the Santa Clara River's north bank, which include the Oxnard Plain basin, the Oxnard Forebay basin, the Pleasant Valley basin, and a portion of the West Las Posas basin.

The City overlies nearly the entire Mound basin. At the time the District implemented the pumping charges to fund Freeman, there was a lack of technical agreement as to the degree pumpers in the Mound basin benefited from District's activities. The City maintained that its wells would not benefit from Freeman and filed several lawsuits seeking to invalidate both the new Freeman-related charges and the District's general pump charges as they applied to City. The parties reached a settlement in 1987. The agreement provided that the Mound basin would be excluded from the Freeman-related charges and a separate billing zone (Zone C) would be established covering the area of the Oxnard Plain basin north of the Santa Clara River. Within Zone C, municipal pumping rates for Freeman were to equal agricultural rates on the Oxnard Plain south of the Santa Clara River. This was accomplished by setting the rates for Zone C equal to a third of the rates for Zone B.

The settlement agreement expired at the end of the 2010-2011 water year when the District paid off its construction loan for Freeman. Beginning in the 2011-2012 water year, Zone C was abolished and incorporated into Zone B, resulting in substantially higher pumping rates for groundwater extractors in the former Zone C. It is this increase in rates to which the City objects.

II.

*The Constitutional Overlay*

Proposition 13 was adopted by the electorate in 1978. It added article XIII A to the California Constitution, "imposing important limitations upon the assessment and taxing powers of state and local governments." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 218.) Its

5

principal provisions set maximum rates for ad valorem property taxes and for increases in a property's assessed valuation. (*Howard Jarvis Taxpayers Assn. v. City of Riverside* (1999) 73 Cal.App.4th 679, 681.) Crucially, Proposition 13 restricted cities, counties, and special districts from imposing "special taxes" except by a two-thirds vote of the district's qualified electors. (Cal. Const., art. XIII A, § 4.) A "special tax" is a tax "imposed for specific purposes," as opposed to a "general tax," which is "imposed for general governmental purposes." (Gov. Code, § 53721; accord, Cal. Const., art. XIII C, § 1, subd. (d).) A local government's use of certain types of special taxes—"ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property"—was prohibited by Proposition 13 altogether. (Cal. Const., art. XIII A, § 4.)

A series of judicial decisions diminished Proposition 13's import by allowing local governments to generate revenue without a two-thirds vote. (See *Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1317-1319 [discussing several such cases].) The watershed case was *Knox v. City of Orland* (1992) 4 Cal.4th 132, in which the California Supreme Court upheld, as a "special assessment" rather than a "special tax," a city's levy on real property to fund park maintenance. A special assessment under *Knox* did not require voter approval at all. It was a "'"compulsory charge placed by the state upon real property within a pre-determined district, made under express legislative authority for defraying in whole or in part the expense of a permanent public improvement therein . . . ."' . . ."' (*Id.* at pp. 141-142.) A special tax, while also levied for a specific purpose, differed from a special assessment in that it need not "confer a special benefit upon the property assessed beyond that conferred generally." (*Id.* at p. 142, fn. omitted.) The result was that Proposition 13's directive of limiting the taxes imposed on property owners, and in particular homeowners, was circumvented through an ever increasing proliferation of special assessments and other property-related fees and charges that were not deemed "taxes." (See *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 839 (*Apartment Association*).)

In response, the voters in 1996 approved Proposition 218, which added articles XIII C and XIII D to the state Constitution. (See *Howard Jarvis Taxpayers Assn.*

6

*v. City of Riverside*, *supra*, 73 Cal.App.4th at p. 682.)  Proposition 218's intent was "to prohibit unratified exactions imposed on property owners as such." (*Apartment Association*, *supra*, 24 Cal.4th at p. 838.)  It restricted local governments attempting to raise funds from property owners to four methods:  (1) an ad valorem property tax, (2) a special tax, (3) an assessment, and (4) a "fee" or "charge" (the terms are interchangeable) for property-related services.  (Cal. Const., art. XIII D, § 3; *Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914, 918.)  Proposition 218 extended Proposition 13's limitations on ad valorem property taxes and special taxes by placing similar restrictions on assessments and property-related fees and charges, including the two-thirds vote requirement.  (*Howard Jarvis v. City of Riverside, supra,* at p. 682.)

While Proposition 218 sharply limited local governments' ability to raise revenue from property owners without their consent, it did little to limit the imposition of regulatory fees imposed on a basis other than property ownership.  Fees classified as something other than "taxes" were not subject to Proposition 13.  For example, in *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, the Supreme Court considered certain "fees" imposed on manufacturers that contributed to environmental lead contamination.  *Sinclair Paint* concluded that the fees funding services for potential child victims of lead poisoning constituted "bona fide regulatory fees, not taxes, because the Legislature imposed the fees to mitigate the actual or anticipated adverse effects of the fee payers' operations, and [by law] the amount of the fees must bear a reasonable relationship to those adverse effects."  (*Id.* at p. 870.)

Largely in response to the *Sinclair Paint* decision, California voters approved Proposition 26 in 2010 to close the perceived loopholes in Propositions 13 and 218 that had allowed "a proliferation of regulatory fees imposed by the state without a two-thirds vote of the Legislature or imposed by local governments without the voters' approval."  (*Schmeer v. County of Los Angeles*, *supra*, 213 Cal.App.4th at pp. 1322, 1326.)  Proposition 26 broadened the constitutional definition of "'tax' to include 'any levy, charge, or exaction of any kind imposed by' the state or a local government, with specified exceptions."  (*Id.* at p. 1326, citing Cal. Const., art. XIII C, § 1; see Prop. 26,

7

§ 1, subd. (f) ["[T]his measure . . . defines a 'tax' for state and local purposes so that neither the Legislature nor local governments can circumvent the[] restrictions [in Props. 13 and 218] on increasing taxes by simply defining new or expanded taxes as 'fees'"].)

Taken together, Propositions 13, 218, and 26 create a classification system for revenue-generating measures promulgated by local government entities. Any such measure is presumptively a tax. If the revenue is collected for a payor-specific benefit or service (see Cal. Const., art. XIII C, § 1, subds. (e)(1) & (e)(2)), certain regulatory costs (see *id.* subd. (e)(3)), the use, lease, or purchase of government property (see *id.* subd. (e)(4)), judicial fines or penalties (see *id.* subd. (e)(5)), or property development charges (see *id.* subd. (e)(6)), it is not a tax. In addition, a measure is not a tax if under article XIII D it constitutes an assessment on real property or a property-related "fee" or "charge." (See *id.* subd. (e)(7).) A fee or charge is "any levy other than an ad valorem tax, a special tax, or an assessment, imposed . . . upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service." (*Id.* subd. (e).)

A measure's classification determines the requirements to which it is subject. Taxes cannot be levied by a special purpose district (such as the District) for general revenue purposes. (Cal. Const., art. XIII C, § 2, subd. (a).) A special purpose district can levy a tax for a specific purpose only with the approval of a majority of voters. (*Id.* subd. (b).)

In order to levy a property-related fee or charge, a number of procedural and substantive requirements must be met. As relevant here, the fee must not "exceed the proportional cost of the service attributable to the parcel." (Cal. Const., art. XIII D, § 6, subd. (b)(3).) Although property-related fees generally require approval by either a majority of the affected property owners or two-thirds of the voters in the affected area, a property-related fee for water service does not. (*Id.* subd. (c).)

A fee or charge for a payor-specific benefit or service that is neither property-related nor a tax must "not exceed the reasonable costs to the local government of conferring the benefit[,] granting the privilege," or "providing the service or product."

8

(Cal. Const., art. XIII C, § 1, subds. (e)(1) & (e)(2).) "[T]he manner in which those costs are allocated to a payor [must] bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." (*Id.* subd. (e)(7).) Such a fee or charge normally does not require voter approval.

III.

*Procedural Background*

After Freeman was paid off and the terms of the 1987 settlement were no longer in force, the District proposed to eliminate Zone C and merge it with Zone B, effectively tripling the City's rate per acre-foot of water. In addition, in both the 2011-2012 and 2012-2013 water years, the District proposed increasing the rate charged District-wide (Zone A). The District notified well owners of the proposed changes and invited them to comment. Only a minority of the well owners, including the City, submitted protest letters. Over the City's objections, the District eliminated Zone C and adopted the proposed rates.

The City filed two lawsuits, which were consolidated. It sought to overturn the District's rate decisions through a writ of mandate (Code Civ. Proc., § 1085), an administrative mandate (*id.* § 1094.5), declaratory relief (*id.* § 1060), and a reverse validation action (*id.* § 860 et seq.). The California Federation of Farm Bureaus, the Ventura County Farm Bureau, and the Pleasant Valley County Water District answered the validation cause of action and intervened in the others.[4] The District filed a cross-complaint seeking declaratory relief upholding its rate determinations in water year 2011-2012.

The City challenged the rates on two fronts. First, it asserted that the statutorily-mandated 3:1 ratio between groundwater extraction rates for non-agricultural and agricultural uses constituted an illegal subsidy for agricultural users at the expense of

---

[4] These parties were not named defendants or respondents except insofar as the City's validation cause of action named as defendants "all persons interested in the validity of the rates adopted by the United Water Conservation District." They are not parties to the appeal. The California Federation of Farm Bureaus filed an amicus brief in support of the District.

other users. Second, the City questioned the propriety of including in the District-wide Zone A rates certain of the District's expenses that the City contended either did not benefit it at all or benefitted it less than other groundwater users. The City maintained that these practices violated Propositions 13, 218, and 26, the common law of ratemaking, and section 54999.7, subdivision (a), of the Government Code (*San Marcos* legislation).[5]

The trial court concluded that the groundwater extraction charges (1) bore a reasonable relationship to the City's burdens on and benefits from the regulatory activity and thus were valid regulatory fees rather than special taxes subject to Proposition 13; (2) were property related fees and charges subject to article XIII D (Prop. 218); and (3) were not, as property related fees, taxes under Proposition 26. The court did not determine whether the *San Marcos* legislation or the common law of utility rate-making applied to the extraction charges but found that, if they did, the charges did not exceed the reasonable cost to the District of providing the service and were reasonable, fair, and equitable.

Analyzing the extraction charges under article XIII D, the trial court similarly found that the charges in the aggregate were reasonably proportional to the District's costs and comported with Proposition 218. However, it found that the 3:1 ratio between rates for non-agricultural and agricultural water use mandated by section 75594 was unconstitutional under Proposition 218 for the water years in question because the District failed to present evidence that the rate differential reflected a cost differential. The court found that the City was entitled to a partial refund in the amount it paid in excess of a rate based upon the District's average cost for all types of water usage. It

---

**5** *San Marcos Water Dist. v. San Marcos Unified School Dist.* (1986) 42 Cal.3d 154 held that, absent legislative authorization, a public entity's constitutional exemption from special assessments prohibited a local water district from imposing a capacity fee for funding capital improvements to the water system. (See *Regents of University of California v. East Bay Municipal Utility Dist.* (2005) 130 Cal.App.4th 1361, 1366.) The *San Marcos* legislation granted that express authorization, subject to certain substantive and procedural requirements.

10

issued writs of mandate awarding the City a partial refund of $548,296.22 for 2011-2012 and $794,815.57 for 2012-2013, plus pre-judgment interest.**6**

The District appeals the trial court's conclusion that Proposition 218 applies to its groundwater extraction charges. In the alternative, it appeals the court's ruling that to satisfy Proposition 218, the District must present quantitative evidence justifying the 3:1 rate disparity rather than pointing to qualitative differences between agricultural and other water users that impact the relative cost of conservation services. The District also appeals the court's decision to award a partial refund rather than to remand to the District so that it can conduct further proceedings to determine whether the 3:1 ratio is justified under article XIII D. Finally, the District contends that the court's refund calculation is incorrect.

The City cross-appeals, seeking declaratory relief. First, it asks us to hold that section 75594's rate ratio is facially unconstitutional. It also requests a declaration that the District must limit its groundwater extraction charges to the cost of providing services that have a demonstrated relationship to groundwater use. In addition, the City seeks a declaration that the District's rate structure must take into account the scientific evidence regarding how different groundwater basins respond to specific recharge efforts rather than charging all groundwater users a uniform rate for District-wide conservation efforts. The City does not challenge the trial court's findings that the groundwater extraction charges were not "special taxes" under Proposition 13 and did not violate the common law of utility ratemaking.

We conclude that the pump charges paid by the City are neither property-related fees nor taxes, that they do not exceed the District's reasonable costs of maintaining the groundwater supply, and that the District allocates those costs in a fair or reasonable relationship to the City's burdens on this resource. Accordingly, we reverse the judgment in favor of the City and direct the trial court to vacate its writs of mandate.

---

**6** The trial court, finding that a writ of mandate and declaratory judgment were the only appropriate forms of relief, denied the petition for writ of administrative mandate and the reverse validation complaint. Neither party contests this aspect of the court's judgment.

11

DISCUSSION

I.

*Standard of Review*

We review de novo a trial court's determinations whether taxes, fees, and assessments imposed by a local governmental entity are constitutional, exercising our independent judgment. (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 448-450.) In the trial court, the governmental entity has the burden of showing, by reference to the face of the record before it, that its charges satisfy the Constitution. (See Cal. Const., arts. XIII A, § 3, subd. (d), XIII C, § 1, subd. (e), XIII D, § 6, subd. (b)(5); see also *California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 436-437.) On appeal, as in any case, the appealing party has the responsibility of affirmatively demonstrating error. (*Morgan v. Imperial Irrigation District* (2014) 223 Cal.App.4th 892, 913.)

"[W]e exercise our independent judgment in reviewing the record," but "we do not take new evidence or decide disputed issues of fact." (*Morgan v. Imperial Irrigation District*, *supra*, 223 Cal.App.4th at p. 912.) Instead, we review the resolution of factual conflicts by the trial court under the substantial evidence standard. (*Id.* at p. 916.) "Under this standard, 'the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact.' [Citation.]"[7] (*Ibid.*; see *Schmeer v. County of Los Angeles*, *supra*, 213 Cal.App.4th at p. 1316.)

---

[7] The City asserts that our "[r]eview of factual issues is de novo" because we are "equally well placed" as the trial court to review the "cold" administrative record. Not so. While the City is correct that in a mandamus action the scope of review can be identical in the trial and appellate courts (see, e.g., *Stone v. Regents of University of California* (1999) 77 Cal.App.4th 736, 745), that is because courts at each level normally give great deference to an agency's factual findings made in support of its action. (*McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1786.) Here, the factual findings under review were made by the trial court, not the District, so we apply the less but still highly deferential "substantial evidence" standard.

## II.

### *Construction of a Voter Initiative*

When construing a provision of the state Constitution brought about by voter initiative, we apply the same interpretive principles governing statutory construction. (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037.) "[O]ur paramount task is to ascertain the intent of those who enacted it." (*Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 290.) We look first to the provision's language as the best indicator of the voters' intent (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 265), giving words their ordinary meaning and construing them in the context of the measure as a whole and its overall scheme. (*Professional Engineers*, at p. 1037.) "'Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure . . . and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language.' [Citation.] Where there is ambiguity in the language of the measure, '[b]allot summaries and arguments may be considered when determining the voters' intent and understanding of a ballot measure.' [Citation.]" (*Ibid.*)

Proposition 218 instructs courts to liberally construe its provisions "to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." (Prop. 218, § 5.) At the same time, repeal of existing legislation by implication is strongly disfavored. (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 807; *St. Cyr v. California FAIR Plan Association* (2014) 223 Cal.App.4th 786, 799.) We presume the validity of a legislative act, resolving all doubts in its favor, and must uphold it unless a "'. . . conflict with a provision of the state or federal Constitution is clear and unquestionable . . . .'" (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1252.)

13

III.

*The Pump Fees Are Not Property-Related Fees or Charges*

The trial court determined that it was constrained by *Pajaro* and, as a result, concluded that the pump fees at issue constituted property-related fees or charges. Before explaining why *Pajaro* is distinguishable, we must discuss the trio of Supreme Court cases underlying its holding: *Apartment Association*; *Richmond v. Shasta Community Services District* (2004) 32 Cal.4th 409 (*Richmond*); and *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205 (*Bighorn*).

A.

*Supreme Court Authority Regarding "Property-Related Fees and Charges"*

*Apartment Association* involved a municipal housing code provision that imposed an annual $12 fee on residential rental property owners to finance the city's cost of inspection and enforcement. (*Apartment Association*, *supra*, 24 Cal.4th at p. 833.) The Supreme Court held that the fee was not subject to Proposition 218 because it was "imposed on landlords not in their capacity as landowners, but in their capacity as business owners." (*Id.* at p. 840.) It thus was "more in the nature of a fee for a business license than a charge against property." (*Ibid.*)

The Court explained that regulatory fees and property-related fees are not mutually exclusive. (*Apartment Association*, *supra*, 24 Cal.4th at p. 838 ["[T]he mere fact that a levy is regulatory . . . or touches on business activities . . . is not enough, by itself, to remove it from article XIII D's scope"].) The hallmark of a property-related fee is that "it applies only to exactions levied solely by virtue of property ownership." (*Id.* at p. 842.) In other words, Proposition 218 applies to "exactions . . . that are *directly* associated with property ownership" and that "burden landowners *as landowners*" rather than on "levies linked more indirectly to property ownership." (*Id.* at pp. 839, 842, first italics added.)

*Richmond* again considered the scope of a property-related fee or charge. The district that supplied water to residential and commercial users imposed a connection fee for new water service, one component of which was a fire suppression charge used to

14

purchase equipment for the volunteer fire department. (*Id.* at pp. 415-416, 425.) A group of real property owners challenged the ordinance as levying an illegal property-related fee. (*Id.* at p. 416.)

While agreeing with the plaintiffs' contention "that supplying water is a 'property-related service' within the meaning of article XIII D's definition of a fee or charge," *Richmond* rejected their broader argument "that *all* water service charges are necessarily subject to the restrictions that article XIII D imposes on fees and charges." (*Richmond*, *supra*, 32 Cal.4th at pp. 426-427.) The Supreme Court distinguished "[a] fee for ongoing water service through an existing connection" from "a fee for making a new connection to the system." (*Id.* at p. 427.) The former "requires nothing other than normal ownership and use of property" whereas the latter "results from the owner's voluntary decision to apply for the connection." (*Ibid.*) Because the charge on the owner's voluntary decision to apply for a service connection was not a charge on the property-related service itself, it was not subject to Proposition 218. (*Id.* at p. 428.)

Finally, in *Bighorn*, a case that *Pajaro* ultimately found dispositive, the Supreme Court reiterated that rates and other charges for water delivery were "property-related" within the meaning of Proposition 218. *Bighorn* involved a local agency that provided domestic water service to residents within its special district. A resident in the district sought to place an initiative on the ballot that would have limited the agency's rates and other water delivery charges. (*Bighorn*, *supra*, 39 Cal.4th at pp. 209-210.) The Court of Appeal held that article XIII C, section 3 of the California Constitution, which vests local voters with the power to "reduc[e] or repeal[] *any local tax, assessment, fee or charge*" by initiative, did not apply to the fees and charges at issue. (See *Bighorn*, at pp. 211-212, fn. omitted.)

The Supreme Court disagreed, finding it obvious that section 3 applied to "fees and charges." The only issue was whether the meaning of "fees and charges" in article XIII C, which does not define the phrase, is coextensive with its meaning in article XIII D, where it is limited to property-related fees and charges. (See Cal. Const., art. XIII D, § 2, subd. (e).) *Bighorn* did not resolve this question other than to conclude that

15

the "fees and charges" in article XIII C included the property-related fees and charges in article XIII D.  Citing *Richmond* for the proposition that "a public water agency's charges for ongoing water delivery . . . are fees and charges within the meaning of article XIII D," the court held that such charges "are also fees within the meaning of section 3 of article XIII C."  (*Bighorn*, *supra*, 39 Cal.4th at p. 216.)

Relying on dictum in *Apartment Association* that "it is unclear . . . whether a fee to provide gas or electricity service is the same as a fee imposed on the consumption of electricity or gas" (*Apartment Association*, *supra*, 24 Cal.4th at p. 844), the agency in *Bighorn* argued that its volumetric charges were based on consumption rather than property and were not subject to Proposition 218.  In its view, only the fixed monthly charge that it imposed on all customers regardless of usage was property-related.

The court rejected this argument.  Pointing out that article XIII D "'includ[es] a user fee or charge for a property related service'" (Cal. Const., art. XIII D, § 2, subd. (e)), *Bighorn* concluded that "[c]onsumption-based water delivery charges also fall within the definition of user fees, which are 'amounts charged to a person using a service where the amount of the charge is generally related to the value of the services provided.'  [Citation.]"  (*Bighorn*, *supra*, 39 Cal.4th at p. 217.)

B.

*Pajaro*

Like the District here, the Pajaro Valley Groundwater Basin faced problems of overdraft and seawater intrusion from decades of groundwater overuse.  The Pajaro Valley Water Management Agency was created by special statute to combat these problems, in part by supplementing the area's water supply with sources other than groundwater.  To that end, the agency was authorized to impose groundwater augmentation charges on the extraction of groundwater.  (*Pajaro*, *supra*, 150 Cal.App.4th at pp. 1370-1372.)

The agency adopted a groundwater management plan that included the construction of a 23-mile pipeline to import water from a neighboring county.  It planned to fund the project in part through higher groundwater augmentation charges against all

16

extractors of groundwater. The charges were levied at a set rate per acre-foot. Metered pumpers, many of which were large, agricultural users, paid based on their actual usage. Non-metered residential users paid a flat fee based on an estimated average rate of consumption per dwelling. (*Pajaro, supra,* 150 Cal.App.4th at pp. 1372-1374.)

The agency brought an action to validate the increased groundwater augmentation charges. The trial court declared the charges valid but the Court of Appeal reversed, holding that they constituted a charge incidental to property ownership. Because the agency had not complied with Proposition 218's procedural requirements for imposing such a charge, the augmentation charge was held invalid. (*Pajaro*, *supra*, 150 Cal.App.4th at pp. 1374-1375, 1393.)

The appellate court characterized the augmentation fee as being "charged in return for the benefit of ongoing groundwater extraction and the service of securing the water supply for everyone in the basin." (*Pajaro*, *supra*, 150 Cal.App.4th at p. 1381, fn. omitted.) Ultimately, though, *Pajaro* concluded that whether the agency's fee was for a "service" was immaterial because it was "imposed as an incident of property ownership." (*Id.* at p. 1389.) Water extraction, the court posited, is "an activity in some ways more intimately connected with property ownership than is the mere receipt of delivered water." (*Id.* at p. 1391.)

*Pajaro* recognized that the conceptually similar *Apartment Association* undermined its conclusion, insofar as that case held that "as an incident of" property ownership means "solely by virtue of" property ownership rather than "on an incident of" property ownership. (*Pajaro*, *supra*, 150 Cal.App.4th at p. 1389.) However, *Pajaro* dismissed *Apartment Association* as being of questionable vitality given that *Bighorn* "did not mention the case at all." (*Ibid.*) *Pajaro* found no material distinction, for article XIII D purposes, between a charge on groundwater extraction and a charge on delivered water. (*Id.* at pp. 1388-1389.) Although the court speculated that the extraction charge might survive scrutiny under *Bighorn* if it were imposed only on non-residential users, the fact that a large majority of pumpers were using the water for residential or domestic uses was dispositive. (*Id.* at p. 1390.)

17

*Analysis*

The level of abstraction at which we should analyze the constitutional text is unclear. Do we determine whether groundwater extraction fees in general are imposed as an incident of property ownership? Or do we focus on the specific fee imposed by the District? And if the latter, do we consider the District's fee without regard to the payor at issue or do we consider the City's purpose in pumping groundwater?

The *Pajaro* court implied that the result could differ at least from district to district if not from user to user when it suggested that a charge on groundwater extracted for nonresidential purposes might fall within the rationale of *Apartment Association*. (*Pajaro*, *supra*, 150 Cal.App.4th at pp. 1389-1390.) But this is far from certain. Our Constitution applies statewide. It would be anomalous to assign its provisions different meanings in different locations. (See Cal. Const., art. IV, § 16, subd. (a) ["All laws of a general nature have uniform operation"]; *Ex parte Smith* (1869) 38 Cal. 702, 710 ["[G]eneral laws . . . shall operate uniformly, or in the same manner upon all persons who stand in the same category, that is to say, upon all persons who stand in the same relation to the law, in respect to the privileges and immunities conferred by it, or the acts which it prohibits"].) Similarly, the City questions how the District "can . . . apply a 'uniform' rate as required by . . . section 74527 that is lawful as to the City but unconstitutional as to rural residential groundwater users."

We need not resolve this issue. Whether we consider this specific pump fee or pump fees in general, we conclude that the fee is not property-related and that article XIII D does not apply.

*Pajaro* was based upon a unique set of facts—"that the vast majority of property owners in the Pajaro Valley obtained their water from wells, and that alternative sources were not practically feasible." (*Pajaro*, *supra*, 150 Cal.App.4th at p. 1397 (conc. opn. of Bamattre-Manoukian, J.).) That is far from the case here. While the record does not disclose the exact number of residential customers who pump water in lieu of connecting to an existing water delivery network, it is evident that this number is

18

insubstantial relative to the number of residential customers receiving delivered water. There are at most 840 parcels with wells in the District. The City, whose 11 parcels account for only about 6 percent of the water extracted from these wells, delivers water to approximately 30,000 residential dwelling units in the District. And of course the City itself uses the water it pumps for commercial rather than residential purposes.[8]

   *Pajaro* also found it significant that the agency's pump charge did not serve a regulatory purpose. (See *Pajaro*, *supra*, 150 Cal.App.4th at p. 1381 [concluding that fee charged to smaller, unmetered wells based on estimated usage was not "justified on regulatory grounds" but that a regulatory purpose "might still be readily invoked with respect to metered extractions"].)[9] According to *Pajaro*, *Bighorn* "le[ft] open the possibility that delivery of water for . . . nonresidential purposes is not a property-based service, and that charges for it are not incidental to the ownership of property. A finding that such a fee is not imposed as an incident of property ownership might be further supported by a clearly established regulatory purpose, e.g., to internalize the costs of the burdened activity or to conserve a supplied resource by structuring the fee in a manner intended to deter waste and encourage efficiency." (*Id.* at pp. 1389-1390, fn. omitted.) Here, as the trial court found, the groundwater extraction fees serve the valid regulatory purpose of conserving water resources. (Cal. Const., art. X, § 2; §§ 75521, 75522.)

---

   [8] The City asserts that its "customers use the groundwater it delivers for residential purposes and it is entitled to speak for its customers." It is true that "a political subdivision of the state may challenge the constitutionality of a statute or regulation on behalf of its constituents where the constituents' rights under the challenged provision are 'inextricably bound up with' the subdivision's duties under its enabling statutes." (*Central Delta Water Agency v. State Water Resources Control Bd.* (1993) 17 Cal.App.4th 621, 629.) But the City's residential water customers lack independent standing to sue the District because they have no rights at stake. Nothing requires the City to obtain its water by pumping, and the City's customers, who do not pay the fees, have only an indirect financial interest in the constitutionality of the District's rates. (Cf. *Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1101, 1104, fn. omitted ["[W]e have permitted consumer intervention into the sales tax scheme in limited circumstances and only by means of a judicial proceeding to compel the retailer/taxpayer to seek a refund" since "[t]he *retailer* is the taxpayer, *not* the consumer"].)

   [9] The City's wells are all metered. We do not necessarily agree with *Pajaro* that charging unmetered residential wells based on estimated usage is incompatible with a regulatory purpose, particularly in a district with large commercial pumpers and only a few residential ones. That issue is not before us.

Even if there were no factual record regarding the relative number of residential versus commercial well owners and a clear regulatory purpose, we would still conclude that a charge on groundwater extraction is not imposed as an incident of property ownership. In *Orange County Water Dist. v. Farnsworth* (1956) 138 Cal.App.2d 518, the Court of Appeal considered a similar pump fee. The charge was challenged, among other reasons, on the ground that "the water which underlies real property is a part of the property itself and that the charge in question is, in effect, a tax levied by reason of ownership of the property . . . ." (*Id.* at pp. 529-530.) The Court of Appeal summarily rejected this argument. It found that "[t]he charge in question is more in the nature of an excise tax levied upon the activity of producing ground water by pumping operations" than "a tax levied by reason of the ownership of property." (*Id.* at p. 530.)

We agree with *Farnsworth* that a pump fee is better characterized as a charge on the activity of pumping than a charge imposed by reason of property ownership. Given this characterization, the facts here are not materially different from those in *Apartment Association*. "The [pump] fee is not imposed solely because a person owns property. Rather, it is imposed because the property is being [used to extract groundwater]. It ceases along with the business operation, whether or not ownership remains in the same hands. For that reason, the [District] must prevail." (*Apartment Association*, *supra*, 24 Cal.4th at p. 838.)

That *Bighorn* did not cite *Apartment Association* is unsurprising. *Richmond* squarely stood for the proposition that charges for domestic water delivery service are property related, even though other charges less directly associated with the provision of water, namely connecting a property to the delivery system, are not. *Bighorn*, like *Richmond*, dealt with "a public water agency's charges for ongoing water delivery." (*Bighorn*, *supra*, 39 Cal.4th at p. 216.) It merely clarified that the charges for this service were subject to Proposition 218 whether they were volume-based "consumption" charges or flat-rate charges "imposed regardless of water usage." (*Id*. at pp. 216-217.) *Apartment Association* was far less relevant than *Richmond* to this issue.

20

The Supreme Court's failure to cite a marginally relevant case does not signal that case's implicit overruling.  (See *Griffith v. City of Santa Cruz* (2012) 207 Cal.App.4th 982, 995 [characterizing *Apartment Association* as "dispositive" of a Prop. 218 challenge].)

Nor do we think it overly important that pumping may not always be a "business operation."  (See *Pajaro*, *supra*, 150 Cal.App.4th at p. 1391, fn. 18 [discussing the distinction set forth in *Apartment Association* between "[a] charge . . . imposed on a person because he *owns* land" and one "imposed because he *engages in certain activity* on his land" and doubting "that it is satisfactorily captured by a distinction between business and domestic uses or purposes"].)  In the City's case, of course, it is.  The City pumps water for the municipal supply, which it then sells to residential customers.  (See *City of South Pasadena v. Pasadena Land & Water Co.* (1908) 152 Cal. 579, 593 ["In administering a public utility, such as a water system, even within its own limits, a city does not act in its governmental capacity, but in a proprietary and only *quasi*-public capacity"].)  But even with respect to the individual household that elects to pump water for its own consumption, the Supreme Court made clear in *Richmond* that residential business operations are not the only household activities exempt from article XIII D.  That article applies only to charges on an activity that "requires nothing other than *normal* ownership and use of property."  (*Richmond*, *supra*, 32 Cal.4th at p. 427, italics added.)  Voluntarily generating one's own utilities arguably is not a normal use of property, and in any event, it is a "business operation" in the sense that it affects the demand for municipal services.  (Cf. *Wickard v. Filburn* (1942) 317 U.S. 111.)

We also disagree with *Pajaro* that the groundwater extraction charge need not constitute a fee for "service" provided by the District in order to fall within article XIII D's scope.  (See *Pajaro*, *supra*, 150 Cal.App.4th at p. 1389 ["The Agency contends that the charge is not a 'service fee,' but that proposition seems beside the point if the charge is imposed as an incident of property ownership"].)  That is simply an untenable construction of the constitutional text, particularly taken in context.

Article XIII D provides that "[t]he amount of a fee or charge imposed upon any parcel or person as an incident of property ownership shall not exceed the

21

proportional cost of the *service* attributable to the parcel." (Cal. Const., art. XIII D, § 6, subd. (b)(3), italics added.) Plainly, this refers to a service fee, albeit one imposed "as an incident of property ownership." (*Id.* at subd. (b)(3).) Most of the other substantive requirements imposed in section 6, subdivision (b) also explicitly apply to fees and charges for local government services. For example, subdivision (b)(1) prohibits revenues from the fee or charge from "exceed[ing] the funds required to provide the property related service." Subdivision (b)(4) states that "[n]o fee or charge may be imposed for a service unless that service is actually used by, or immediately available to, the owner of the property in question." It also forecloses "[f]ees or charges based on potential or future use of a service." (*Ibid.*) Subdivision (b)(5) proscribes charges for "general governmental services including, but not limited to, police, fire, ambulance or library services, where the service is available to the public at large in substantially the same manner as it is to property owners." These provisions refer to property-related *services*.

California Constitution, article XIII D, section 3 confirms this interpretation. It provides in relevant part that "[n]o tax, assessment, fee, or charge shall be assessed . . . upon any parcel of property or upon any person as an incident of property ownership except . . . [f]ees or charges for property related services as provided by this article."[10]

We think it self-evident that in charging property owners for pumping groundwater, the District is not providing a "service" to property owners in the same way that the *Bighorn* agency provided a service by delivering water through pipes to residences. The conceptual difficulty with a contrary conclusion is apparent from *Pajaro*'s attempt to define what the "service" at issue is. In its view, the District's service is "securing the water supply for everyone in the basin." (*Pajaro*, *supra*, 150 Cal.App.4th

---

[10] California Constitution, article XIII D, section 2 defines "property-related service" as "a public service having a direct relationship to property ownership." Section 6, subdivision (b)(5), notes that "a significant factor in determining whether a fee or charge is imposed as an incident of property ownership for purposes of this article" is the agency's "[r]eliance . . . on any parcel map, including, but not limited to, an assessor's parcel map."

at p. 1381, fn. omitted.) But, if so, such a service cannot meet the requirement that it be "actually used by, or immediately available to, the owner of the property in question." (Cal. Const., art. XIII D, § 6, subd. (b)(4).) Moreover, it would fall within the realm of prohibited "[f]ees or charges based on potential or future use of a service." (*Ibid.*) Worse still, such a service is "available to the public at large in substantially the same manner as it is to property owners." (*Id.* at subd. (b)(5).) There is a fundamental conflict between a pump fee's classification as a property-related service and its validity under article XIII D.

The recently enacted Sustainable Groundwater Management Act (Stats. 2014, chs. 346, 347, 348) (SGMA) bolsters our conclusion that the groundwater extraction fees here are not subject to article XIII D. Although the SGMA's amendments to the Water Code do not apply to the District because it is not currently part of a groundwater sustainability agency, the SGMA's treatment of groundwater extraction fees is instructive. The Legislature authorized such fees in two separate sections. In section 10730.2, the Legislature expressly required that fees "to fund costs of groundwater management," including the "[s]upply, production, treatment, or distribution of water," be adopted in accordance with article XIII D. (§ 10730.2, subds. (a), (c).) Fees authorized pursuant to section 10730 "to fund the costs of a groundwater sustainability program" have no such requirement. (§ 10730, subd. (a).) That the Legislature required groundwater sustainability agencies to impose some but not all groundwater extraction fees in compliance with article XIII D suggests that, in its view, compliance is not constitutionally required. (See *In re Ethan C.* (2012) 54 Cal.4th 610, 638 ["When language is included in one portion of a statute, its omission from a different portion addressing a similar subject suggests that the omission was purposeful"].)

We thus conclude that groundwater extraction charges are not property-related charges or fees. Even if they were, however, we see no conflict between Proposition 218's substantive requirements and section 75594's required rate ratio. Proposition 218 mandates that the amount of the fee imposed on a parcel or a person as an incident of property ownership "not exceed the proportional cost of the service

23

attributable to the parcel." (Cal. Const., art. XIII, § 6, subd. (b)(3).) Section 75594 does not discriminate between persons or parcels. It discriminates between types of use. (Cf. *City of Palmdale v. Palmdale Water Dist.* (2011) 198 Cal.App.4th 926 [local agency rates for delivered water violated Proposition 218 where agency discriminated among types of *users* even though "residential" users could use water for agricultural purposes].) If the City chooses to use its groundwater for agricultural purposes, it too can benefit from the lower rates.

That the City's desired use for the water it pumps is subject to a higher regulatory fee than agricultural use is a policy decision made by the Legislature, not the District. Section 6 of article XIII D governs only property-related fees and charges imposed by *local* government agencies. It does not govern the Legislature's statewide regulatory policy, particularly a policy decision made decades before the passage of Proposition 218. We "are required to try to harmonize constitutional language with that of existing statutes if possible." (*Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.* (2012) 209 Cal.App.4th 1182, 1192.) Because "it is possible to reconcile the language of Proposition 218 with [section 75594's mandatory rate ratio] existing at the time of its passage, we must do so." (*Ibid.*)

IV.

*The Pump Fees Are Not Taxes*

The trial court found that the pump charges did not constitute "taxes" under Proposition 26's broader definition because they fell into the exception for property-related fees and charges under article XIII D. Since we hold otherwise, we must address the City's alternative contention that the pump charges are taxes that were imposed in violation of Proposition 26.

A.

*The Pump Fees Are for Payor-Specific Benefits*

Pursuant to Proposition 26's presumption that "any levy, charge, or exaction of any kind imposed by a local government" is a tax, the pump fees must be taxes unless

24

they fall into one of seven enumerated exceptions.  (Cal. Const., art. XIII C, § 1, subd. (e).)  We only need consider two of these exceptions, which apply to varying extents.

The third exception contains an exhaustive list of regulatory activities for which a local government can recover its reasonable costs through fees:  "issuing licenses and permits, performing investigations, inspections, and audits, enforcing agricultural marketing orders, and the administrative enforcement and adjudication thereof."  (Cal. Const., art. XIII C, § 1, subd. (e)(3).)  Many of the costs associated with managing, protecting, conserving, and enhancing the District's water resources lie beyond the scope of this exception, but not all.  In particular, the District is authorized to "make surveys and investigations" of its water supply and resources.  (§ 74520.)  These costs, to the extent they are included in the pump fees, are not taxes.

The District's strongest argument that the groundwater extraction fees are not taxes is that they fall within the first exception for payor-specific benefits and privileges.  Pumpers receive an obvious benefit—they may extract groundwater from a managed basin.

The City complains that pumpers are merely exercising their existing property rights and that the District "does not grant the City a right or privilege to use groundwater any more than the County grants a homeowner the right to live in his or her home when collecting the property tax."  This analogy is inapt.  A pump fee is more like the entrance fee to a state or local park, which is not a tax (see Cal. Const., art. XIII C, § 1, subd. (e)(4); *id.* art. XIII A, § 3, subd. (b)(4)).  Although citizens generally have the right to enter such public land, the government is entitled to charge them a fee for its efforts to maintain the land so that it can be enjoyed by all who use it.  (See Pub. Resources Code, § 5010.)  Without the District's resource management operations, groundwater would be depleted far faster and overdraft in the District would be far more severe.  The District's conservation efforts thus constitute a specific benefit that accrues directly to those who use groundwater.  Consequently, the pump fees are not taxes if, as the trial court found, they do not exceed the District's reasonable costs of groundwater management.

25

B.

*The Pump Fees Do Not Exceed the District's Reasonable Costs*

"A regulatory fee does not become a tax simply because the fee may be disproportionate to the service rendered to individual payors. [Citation.] The question of proportionality is not measured on an individual basis. Rather, it is measured collectively, considering all rate payors. [Citation.] [¶] Thus, permissible fees must be related to the overall cost of the governmental regulation. They need not be finely calibrated to the precise benefit each individual fee payor might derive. What a fee cannot do is exceed the reasonable cost of regulation with the generated surplus used for general revenue collection. An excessive fee that is used to generate general revenue becomes a tax." (*California Farm Bureau Federation v. State Water Resources Control Bd.*, *supra*, 51 Cal.4th at p. 438; accord § 75596 [providing that groundwater charges "shall not produce funds for district purposes that would exceed such amount as is deemed necessary by the district board to be used in furtherance of district purposes in the replenishment, augmentation, and the protection of water supplies for users within the district"].)

The trial court found that "the basins within the [District's] boundaries are [hydrogeologically] interconnected in complex and incompletely explained ways." We agree. The record contains substantial evidentiary support for this finding.

The City does not dispute that the actions of one pumper in the District affects every other pumper to *some* degree; rather, it criticizes the District for "impos[ing] District-wide rates that assume an equal degree of service to pumpers throughout its basins and three times the service to [municipal and industrial users] as to agriculture." Yet, by imposing fees based upon the volume of water extracted, the District largely *does* charge individual pumpers in proportion to the benefit they receive from the District's conservation activities. The District ensures water availability District-wide. Large-scale users such as the City receive a far greater benefit from individual landowners who pump water for personal consumption. That is more than is required. The District need only ensure that its charges in the aggregate do not exceed its regulatory costs.

26

The City specifically challenges three expenditures allocated to the District-wide Zone A charges: the cost to treat and deliver surface water to overdrafted coastal areas; the cost of purchasing water from the State for delivery to water customers; and the "recreation activities subfund," which the City asserts includes the cost of potable water delivery to the concessionaire at Lake Piru. The City contends these costs are unrelated to groundwater augmentation and management.

Contrary to the City's assertion, the recreation activities subfund is actually supported by revenue from the concessionaire at Lake Piru and the ad valorem property taxes collected by the District. Likewise, the District pays for its State water allocation primarily from an annual voter-approved property assessment.

More generally, the City is incorrect that the District's costs associated with the acquisition, treatment, transport, and delivery of State and surface water are unrelated to its groundwater management goals. The District sells water to customers who use the delivered water in lieu of water pumped from the ground, particularly in coastal areas where the problem of seawater intrusion is most acute. Although the City's wells are not located in these critical areas, it pumps the majority of its water from wells in the Oxnard Plain basin, which contributes to the problem by removing water that would otherwise flow to the critical areas near the coast. In any event, providing pumpers with a substitute to groundwater use eases the overall burden on the resource in the District.

On independent review we conclude that the District's pump fees do not exceed the reasonable cost of regulating the District's groundwater supply. Accordingly, these regulatory fees are not taxes and are not subject to approval by the voters.

V.

*San Marcos Litigation*

We agree with the trial court that, insofar as the *San Marcos* legislation applies, the District complied with it. The *San Marcos* legislation requires that when a public agency provides a "public utility service" to another public agency, the service fee cannot "exceed the reasonable cost of providing the public utility service." (Gov. Code, § 54999.7, subd. (a).) As we have explained, the District does not provide a "service" to

27

groundwater pumpers, many if not most of whom are not "public agencies," and its fees are not excessive in light of its reasonable costs.

DISPOSITION

The judgment is reversed insofar as it granted mandamus and declaratory relief to the City. The matter is remanded to the superior court with directions to vacate its writs of mandate in case numbers VENCI 00401714 and VENCI 1414739. The judgment is affirmed in all other respects. The District shall recover its costs on appeal.

CERTIFIED FOR PUBLICATION.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

28

Thomas P. Anderle, Judge

Superior Court County of Santa Barbara

_____

Ariel Pierre Calonne, former City Attorney, Keith Bauerle, Assistant City Attorney; Colantuono & Levin; Colantuono, Highsmith & Whatley, Michael G. Colantuono, David J. Ruderman, Michael R. Cobden, for Appellant City of San Buenaventura.

Musick, Peeler & Garrett, Anthony H. Trembley, Gregory J. Patterson, Cheryl A. Orr, for Appellants United Water Conservation District and Board of Directors of United Water Conservation District.

Nancy N. McDonough and Christian C. Scheuring for California Farm Bureau Federation as Amicus Curiae on behalf of Appellant United Water Conservation District.